HARRY M. WEENIG *v.* MARK A. WOOD.

[No. 2-974A228. Filed June 21, 1976. Rehearing denied July 20, 1976. Transfer denied October 20, 1976.]

414

*James L. Beattey, Frederick J. Graf,* of Indianapolis, for appellant.

*Stephen Goldsmith, Edward O. DeLaney, Barnes, Hickam, Pantzer & Boyd, of Indianapolis,* for appellee.

SULLIVAN, J.—Plaintiff Mark A. Wood filed this action for damages against Harry M. Weenig and a corporation of which Weenig was president, G. P. International, Inc., for allegedly defamatory statements made by Weenig on at least nine different occasions from February to April of 1971. The substance of the suit was that Weenig, then president and a director of Markway Press, Inc., publicly accused Wood, then

a shareholder, director and employee of Markway Press, of embezzling funds from the company.

The claim against G. P. International, Inc., was dismissed pursuant to Ind. Rules of Procedure, Trial Rule 41 (A). The suit against Weenig was tried to a jury. The jury awarded Wood $150,000 actual damages and $50,000 punitive damages. The trial court reduced this award as "excessive" to $25,000 actual damages, $5,000 punitive damages, and entered judgment for Wood for the reduced amount. Both parties appeal. Weenig complains of the procedures followed below, of certain instructions, of the sufficiency of the evidence, and of the proof of damages. Wood alleges error in the trial court's reduction of the jury's award of damages. By Order dated October 18, 1974, the two appeals were consolidated. The issues, arguments and facts related thereto are considered in order as follows:

## I.

### NO REVERSIBLE ERROR IN TRIAL COURT'S REFUSAL TO GRANT WEENIG'S TR. 12(B)(2) MOTION TO DISMISS

Prior to filing an answer, Weenig moved to dismiss Wood's complaint for lack of jurisdiction over his person pursuant to Ind. Rules of Procedure, Trial Rule 12(B)(2). In the motion Weenig noted that he had been served by registered mail at his residence in Salt Lake City, Utah. Weenig complains that "[t]here is no showing in the pleadings that the same are based upon any injury or damage by an act or omission done within this state as required by Trial Rule 4.4 of the Indiana Rules of Procedure". We hold that the trial court's overruling of Weenig's motion does not present cause for reversal.

Wood contends that the court below had jurisdiction of Weenig's person under the terms of TR. 4.4(A), which states in part, that:

"(A) Acts serving as a basis for jurisdiction. Any person or organization that is a nonresident of this state, a resi-

dent of this state who has left the state, or a person whose residence is unknown, submits to the jurisdiction of the courts of this state as to any action arising from the following acts committed by him or his agent:

(1) doing any business in this state;

(2) causing personal injury or property damage by an act or omission done within this state;

(3) causing personal injury or property damage in this state by an occurrence, act or omission done outside this state if he regularly does or solicits business or engages in any other persistent course of conduct, or derives substantial revenue or benefit from goods, materials, or services used, consumed, or rendered in this state; . . ."

Wood argues that since the evidence demonstrates that Weenig uttered most of the defamatory statements in Indiana, the trial court had jurisdiction of Weenig's person under TR. 4.4(A)(2). *See Neill v. Ridner* (1972), 153 Ind. App. 149, 286 N.E.2d 427. Wood's argument is correct so far as it goes, but it does not resolve the issue because Weenig's contention is that we must reverse, and the court below should have dismissed Wood's claim at the initial stage, because the pleadings did not show that Wood's action arose from any of the acts specified in TR. 4.4(A).

Under our law as it existed prior to adoption of the current Indiana Rules of Procedure, it was not necessary for a plaintiff to allege in his complaint facts disclosing that jurisdiction of the person of the defendant could be obtained by the mode of service of summons which was to be employed. A demurrer to a complaint upon grounds of lack of jurisdiction of the person was deemed appropriate only where the lack of jurisdiction appeared affirmatively upon the face of the complaint. Ind. Ann. Stat. § 2-1007 (Burns 1967). *Delaware Township v. Board of Commissioners of Ripley County* (1901), 26 Ind. App. 97, 59 N.E. 189; Gavitt, *Indiana Pleading and Practice* § 125 (1950). If the record were to demonstrate, however, e.g., as by the sheriff's return, that jurisdiction had not been acquired, the defendant might by special appearance and motion to quash summons or the return thereon, or by

verified answer attack the jurisdiction of the court over his person. *See* 1 Wiltrout, *Indiana Practice* §§ 126, 384 and 408. If such defect did not appear of record, the defendant before appearing generally or pleading to the merits was required to raise the question by affirmatively pleading it in an answer in abatement. *See* 1 Wiltrout, *Indiana Practice* §§ 126, 384, 408 and 472(8). The defendant, of course, bore the burden of proof upon such answer in abatement. *Greis* v. *Herbert* (1940), 108 Ind. App. 369, 27 N.E.2d 924; *Henwood* v. *State ex rel. Streiby* (1895), 11 Ind. App. 636, 39 N.E. 289.

The current rules of practice, of course, have abolished the special appearance, the demurrer, and the answer in abatement. Such changes are not, however, of meaningful significance in this case for nothing in the current Indiana Rules of Procedure indicates an intended abandonment of the prior well established law as set forth in *First Bank of Valparaiso* v. *Crumpacker* (1950), 120 Ind. App. 317, 323, 90 N.E.2d 912, 915 quoting from *Galpin* v. *Page* (1873), 85 U. S. 350, 21 L. Ed. 959:

> " 'It is undoubtedly true that a superior court of general jurisdiction, proceeding within the general scope of its powers, is presumed to act rightly. All intendments of law in such cases are in favor of its acts. It is presumed to have jurisdiction to give the judgments it renders until the contrary appears. And this presumption embraces jurisdiction not only of the cause or subject matter of the action in which the judgment is given, but of the parties also. The former will generally appear from the character of the judgment and will be determined by the law creating the court or prescribing its general powers. The latter should regularly appear by evidence in the record of service of process upon the defendant or his appearance in the action. But when the former exists, the latter will be presumed. This is familiar law, and is asserted by all the adjudged cases. . . . But the presumptions, which the law implies in support of the judgments of superior courts of general jurisdiction, only arise with respect to jurisdictional facts concerning which the record is silent. Presumptions are only indulged to supply the absence of evidence or averments respecting the facts presumed.' "

Accordingly, we determine that plaintiffs now, as formerly, are not required to make jurisdictional allegations in the complaint.

Thus, under present law, when Ind. Rules of Procedure, Trial Rule 12(B)(2) is read in conjunction with Trial Rule 8(C), it is apparent that a defendant at his option might now present his jurisdictional claim either by resort to the affirmative defense enumerated in TR. 8(C) or by motion pursuant to TR. 12(B)(2). 1 Harvey, *Indiana Practice,* Author's Comments 12.2, p. 605, and 4.4 (A) (viii), p. 313.

TR. 8(C) provides in part as follows:

"(C) Affirmative defenses. A responsive pleading shall set forth affirmatively and carry the burden of proving: . . . lack of jurisdiction over the person, . . . and any other matter constituting an avoidance, matter of abatement, or affirmative defense. A party required to affirmatively plead any matters, including matters formerly required to be pleaded affirmatively by reply, shall have the burden of proving such matters."

TR. 12(B)(2) provides insofar as pertinent as follows:

"(B) How presented. Every defense, in law or fact, to a claim for relief in any pleading, whether a claim, counter-claim, cross-claim, or third-party claim, shall be asserted in the responsive pleading thereto if one is required; except that at the option of the pleader, the following defenses may be made by motion:

\* \* \*

(2) Lack of jurisdiction over the person,"

TR. 12(H)(1) is also indicative of the option available to the defendant. It states in part:

"(H) Waiver or preservation of certain defenses.

(1) A defense of lack of jurisdiction over the person, . . . is waived to the extent constitutionally permissible

\* \* \*

(b) if it is neither made by motion under this rule nor included in a responsive pleading or an amendment thereof permitted by Rule 15(A) to be made as a matter of course."

In any event, and notwithstanding the particular procedural vehicle used by a defendant to attack jurisdiction over his person, he bears the burden of proof upon that issue, unless, of course, the lack of jurisdiction is apparent upon the face of the complaint itself.

The caption of Wood's complaint designates as defendants "Harry M. Weenig, and G. P. International, Inc., *an Indiana Corporation* . . . ." (Emphasis supplied). The first paragraph of the complaint avers that Weenig "is president and chief executive officer of defendant G. P. International, Inc." The second paragraph alleges that "[a]cting individually *and in his capacity as* president of G.P. International, Inc., defendant Harry M. Weenig on various occasions . . . stated and published to various third persons [the alleged defamatory statements]." (Emphasis supplied). It would not be unreasonable to infer from the caption and these averments that Weenig had ". . . submit[ted] to the jurisdiction of the courts of this state as to [an] action arising from . . . acts committed by him . . . (1) doing any business in this state [or] (2) causing personal injury or property damage by an act . . . done within this state . . . ." TR. 4.4(A). Weenig's motion to dismiss does not contain any assertion to the contrary.

When the court below ruled on Weenig's TR. 12(B)(2) motion, the only information then before it bearing upon the question of the situs of the alleged defamations was contained in the complaint and in defendant's motion. Defendant did not, therefore carry his burden to establish the lack of in personam jurisdiction. To the contrary, viewing the facts as they unfolded at trial, he could not have done so. There was evidence before the jury which established that Weenig published many of the defamations in Indiana. The court had jurisdiction *in fact* of Weenig's person from the time of proper service pursuant to TR. 4.4(A)(2), 4.4(B)(1), 4.1(A)(1) and 4.11.

Denial of Weenig's Motion to Dismiss was not error.

## II.
## NO ERROR IN DENIAL OF WEENIG'S MOTION
## FOR SUMMARY JUDGMENT

Weenig asserts reversible error in the court's overruling of his motion for summary judgment.

The record contains an order book entry showing that on September 24, 1973 ". . . defendant . . . by counsel . . . files Motion for Summary Judgment. . . ." Following this entry is Weenig's motion, which states that:

> "[t]his motion is based upon the affidavit of movant and is founded upon the legal principle that a release by a plaintiff of one tortfeasor, defendant Georgie Porgie Shoppes International, Inc. constitutes a release as to the other tortfeasor, defendant Harry M. Weenig."

No affidavit or release follows this motion in the record. The next relevant entry is Wood's "Reply to Defendant's Motion for Summary Judgment" in which Wood argues that defendant's motion is "inadequate and should be denied" because, *inter alia:*

> "[The] [m]otion states that it is based upon the affidavit of movant. However, no such affidavit has been served upon plaintiff, nor has plaintiff been able to find a copy thereof in the file maintained by the Court. In addition, the record of this action does not contain a dismissal, a covenant not to sue, or a release in any form."

The "Affidavit of Defendant Harry M. Weenig" and a copy of the purported release *follow* Wood's "Reply" in the record. No order book entry indicating a proper filing precedes these papers in the record. Unlike Wood's "Reply to Defendant's Motion for Summary Judgment", neither the "affidavit" nor the "release" bear a file stamp by the clerk of the trial court. Remarkably, the affidavit is dated as having been prepared in Utah *after* the Motion for Summary Judgment incorporating it was filed in the court below. The next page in the record is the trial court's summary entry overruling Weenig's motion for summary judgment.

Considering the state of the record as described above, Wood's argument that the "affidavit" and release referred to in Weenig's summary judgment motion were not before the trial court when it ruled on Weenig's motion, is more plausible than is the contrary inference. Obviously, if the affidavit and purported release upon which the motion were based were not before the court, the court did not err in concluding that Weenig had failed to "show that there [was] no genuine issue as to any material fact and that [he was] entitled to judgment as a matter of law," TR. 56(C). *Renn* v. *Davidson's Southport Lumber Co., Inc.* (1973), 157 Ind. App. 446, 300 N.E.2d 682, 686.

Even were we to suppose that Weenig's affidavit and the purported release were properly before the trial court when it ruled on Weenig's TR. 56 motion, we would not reverse. A "release" is an affirmative defense which must be raised in a party's responsive pleading. TR. 8(C). While true that the purported release was supposedly not executed until after Weenig filed his answer, it was executed nearly two years prior to Weenig's motion for summary judgment yet Weenig made no attempt to amend his answer so as to preserve his right to assert the "release" defense. *See* TR. 15(A) ; 1 Harvey, *supra* 8.6, p. 483. Weenig's failure to plead the release as a defense constituted a waiver of his right to later raise such defense. *See Miller* v. *Griesel* (1974), 261 Ind. 604, 308 N.E.2d 701.

### III.

### NO REVERSIBLE ERROR IN TRIAL OF THIS CAUSE BY SIX JURORS

Six persons constituted the jury in the court below. Rule TR. 48 permits the parties to stipulate that the jury shall con-

sist of less than twelve persons.[1] Weenig points out that the record contains no express stipulation by the parties that a jury of less than twelve was agreed upon and contends that such is grounds for reversal.

Weenig's claim of error is without merit. While true that the record does not contain written stipulations as to a six-person jury, neither does it contain any timely objection to proceeding thusly. Weenig's failure to object in the court below is fatal to his argument. We agree with the Civil Code Study Commission that TR. 48 does not change "prior Indiana case law holding that failure of a party to object to trial by less than twelve jurors is a waiver of the right to have the case tried by twelve." Civil Code Study Commission Comments to TR. 48, in 3 Harvey, *supra,* at 356; *See Beynon* v. *Brandywine Co.* (1872), 39 Ind. 129, 134; *accord,* 9 Wright & Miller, *supra,* § 2491, p. 479.

## IV
## NO SHOWING THAT VERDICT WAS LESS THAN UNANIMOUS

Weenig cites TR. 48 and complains that "the parties did not stipulate at any time before the verdicts were announced that a verdict of a 'stated majority of the jurors shall be taken as the verdict of the jury'." In this connection, Weenig points out that "the record does not affirmatively state whether the verdicts were unanimous or whether they were simply a stated majority of the jurors sitting."

Weenig's assertion concerning the silent record fails to present even a hint of inference that the verdict was less than

---

1. TR. 48 states that:

"The parties may stipulate that the jury shall consist of any number less than twelve [12] at any time before the jury is selected or that a verdict or a finding of a stated majority of the jurors shall be taken as the verdict or finding of the jury at any time before the verdict has been announced."

unanimous. Furthermore an uncontroverted affidavit by Wood's counsel submitted in opposition to Weenig's motion to correct errors, *see* TR. 59(D), stated that affiant had polled the jury and found its verdict to be unanimous. Thus we dispose of a virtually specious argument.

## V.
## WEENIG'S LACK OF INDIANA TRIAL COUNSEL IS NOT CAUSE FOR REVERSAL

A common thread of Weenig's preceding procedural arguments is that the absence of local counsel during most of the proceedings below deprived him of a fair trial. Weenig's appellate counsel stressed this point in oral argument before this court, pointing to the lack of affidavits in support of Weenig's motions to dismiss and for summary judgment, the failure of Weenig's trial counsel to timely object to the absence of stipulations to a six person jury, and the failure to remove this case to federal court once diversity was obtained by the dismissal as to the Indiana corporate codefendant, as evidence of the unfamiliarity of Weenig's Utah counsel with Indiana procedure. Weenig argues that the court below erred in allowing the trial to proceed after his Indiana counsel withdrew.

Mr. Thomas R. Blonquist, a Salt Lake City attorney, represented Weenig also of Salt Lake City, throughout the pre-trial and trial proceedings. An Indianapolis attorney assisted Mr. Blonquist until November of 1973, when he was permitted to withdraw when it became apparent that he would be called as a witness. *See* Code of Professional Responsibility, Discipinary Rule 5-102. Mr. Blonquist did not object to the local attorney's withdrawl. At that time the trial court inquired of Mr. Blonquist whether he wished to obtain Indiana counsel, and even suggested to the Utah attorney that he should do so. However, Mr. Blonquist elected to fly solo.

Obviously, a passing acquaintance with the procedural law of the forum is a valuable, if not indispensible tool of the trial

lawyer. It may well be that Weenig's Utah counsel underestimated the need for such knowledge or overestimated his own knowledge in this regard. While true that the record does not show that Weenig was specifically made aware of the pitfalls of relying solely upon Utah trial counsel, we cannot ignore Weenig's claimed status as an experienced and travelled businessman undoubtedly not wholly ignorant of the workings of our legal system. We therefore do not perceive the interests of justice and fair play in this case to require us to vary the general rule that the inadequacy of the attorney is the inadequacy of the client. *See Moe* v. *Koe* (1975), 165 Ind. App. 98, 330 N.E.2d 761, 765.

## VI.
## VERDICT SUPPORTED BY SUFFICIENT EVIDENCE UPON NECESSARY ELEMENTS OF WOOD'S CLAIM FOR RELIEF

Weenig launches a broadside attack upon the verdict, asserting that it is erroneous because unsupported by sufficient evidence upon the necessary elements of Wood's claim. Specifically, Weenig argues that:

(1) The statements attributed to him by Wood were not shown to be defamatory;

(2) Wood failed to show that Weenig acted maliciously in making the alleged defamatory statements;

(3) Wood's claim fails because Weenig was protected by an absolute privilege;

(4) Wood's claim fails because he failed to overcome the protection which Weenig asserts stemmed from a qualified privilege to make the statements in question; and

(5) Weenig showed the defamatory statements to be justified because substantially true.

A recitation of the facts most favorable to the verdict is required. There was evidence from which the jury could have found that Weenig made defamatory remarks to various third persons in various places on at least nine different occasions

from February through April of 1971. The substance of the statements on all occasions was the same: that Wood had embezzled funds from Markway Press, Inc., a corporation in which Wood and Weenig were mutually interested. Essential to the questions of the accuracy of Weenig's accusations, of Weenig's mental state in thus charging Wood, and the problems of qualified privilege, is an understanding of the business relationships of the parties and the corporate entities involved.

In the mid-1960's, Wood was in business for himself in Indianapolis designing and selling advertising brochures for hospitals, doing business sometimes as M. A. Wood Co. and sometimes as Mark Wood Associates. The booklets themselves were called "Hospital Guideways" or simply "Guideways", and Wood testified that he, as M. A. Wood Co. or Mark Wood Associates, often did business under the two names given the brochures. None of these "companies" were formally incorporated.

In 1968 Wood founded Markway Press, Inc., to print the hospital brochures. Markway Press was formally incorporated sometime prior to 1970. John K. Thorne and Dr. Frederick Kavanagh joined Wood as its shareholders and directors. Thorne, Kavanagh, and John Carr, Markway's corporate counsel, were directors of Markway with Wood and Weenig during the period of the alleged defamations.

From the time of its incorporation in the late 1960's through the period of the defamations in early 1971, Markway Press, Inc., printed the hospital brochures designed and sold by Woood, d/b/a Guideways or Mark Wood Associates. The hospitals who bought the brochures were not aware of the existence of Markway Press but dealt only with Wood or salesmen employed by Wood. When a sale was made, the customer-hospital would make out its check payable either to Guideways or to Mark Wood Associates, and the check would then be deposited in a checking account opened in the name of Guideways or Mark Wood Associates by Wood himself or another salesman. Several such accounts existed around the

country. Ideally, the proceeds of each sale would be split immediately, 60% thereof being paid to Markway Press, Inc., and 40% being retained by Wood, d/b/a Guideways. However, Wood acknowledged that the proceeds of each check were not always promptly divided, but that the funds were sometimes held in Guideways accounts for indefinite periods, to be drawn upon up to 40% of the gross amount by Wood or other Guideways salesmen. Wood's fellow Markway Press directors were aware of and acquiesed in the manner of doing business as described above.

In January of 1970, the Markway Press Board of Directors approved Wood's plan to develop two Guideways "franchises", or branch offices, in Salt Lake City, Utah and southern California. To effectuate his plan, Wood and one of his Guideways salesmen, John Stamm, opened checking accounts in the Guideways name in Salt Lake City and Laguna Beach, California. As with other Guideways accounts located around the country, checks received by Wood and Stamm for hospital booklets sold were deposited in these accounts and both men withdrew funds from the accounts up to 40% of the gross to cover their own expenses and, in Stamm's case as commissions earned. While Wood's fellow Markway directors were aware of the Guideways "franchises" being developed in Utah and California, they were not aware of the existence of the bank accounts until Weenig in the course of his alleged defamations of Wood brought it to their attention.

Weenig became president, chief operating officer and a director of Markway Press, Inc. on February 3, 1971. Weenig had been called in because Markway was experiencing financial and managerial difficulties and Weenig was the president of a team management service (G. P. International, Inc.) with a proven ability to help small corporations long on ideas but short on capital and management expertise. Weenig had accepted the offer of the then directors of Markway to manage and invest in the company in return for, *inter alia,* a transfer of 80% of Markway Press stock to G. P. International. Under

the arrangement Wood, d/b/a Guideways, was to retain sales rights and continue selling the hospital booklets printed by Markway.

Before becoming involved in Markway Press, Weenig thoroughly investigated the company with the aid of his accountant, Byron Larson. In December of 1970 and January of 1971, Wood furnished Weenig and Larson with complete financial statements on Markway Press, allowed Larson to go through Markway's books, and discussed with Weenig the business relationship of "Guideways" and Markway as hereinbefore described as well as the Guideways franchises being developed in Utah and California. After the February 3, 1971 agreement was reached, Wood on his own initiative furnished Weenig and Larson "every bit of information I had at my hands", including the monthly statements and checkbooks for the Utah, California and other Guideways accounts. The transfer of control of Markway complete, Wood went to California to sell brochures and left the management of Markway Press in Weenig's hands.

Wood returned to Indianapolis on February 18 when, in response to his query as to the state of Markway's affairs, Weenig had told him over the telephone from Indianapolis that "[t]hings are pretty bloody back here. . . . You had better come back." Plaintiff went to the Markway Press plant on February 19 where he met with Weenig, Thorne and Kavanagh in what was, by Wood's account, a heated session lasting several hours. It was in this directors' meeting that the first alleged defamation occurred. Wood testified that, after "confronting" him with the information about the Utah and California Guideways accounts, Weenig stated that:

> ". . . we would like to ask for your resignation as officer and director of this corporation. . . . On the grounds you have misappropriated funds from the company; that you have done wrongful acts; you have done things that are way beyond the scope of your authority and that you are not fit to be a part of the corporation. We also have enough evidence that we could send you to jail for 20 years."

Thorne corroborated Wood's version of Weenig's statements at the February 19 meeting, and Weenig's position that his accusations were grounded in Wood's handling of the Utah and California Guideways checking accounts.

There was evidence from which the jury could have found defamations by Weenig of Wood on perhaps eight occasions, to different audiences, other than the February 19 Markway Press Board of Directors meeting.[2]

Markway Director John Carr testified that he and other Markway directors were told by Weenig on February 17, 1971, that "Wood's activities were improper and such actions were the same as misappropriation of funds of the corporation." In mid-February of 1971, Weenig told Guideways salesman John Stamm that "Wood was an embezzler, that he had taken $487,000 or $480,000." In early February, Weenig gratuitously told Robert Wells, a friend of Wood's who had been renting office space from Markway Press, on an occasion when Wells was inquiring about his rent, "that Mark was a crook . . . and he was ready to put Mark in jail." In late February, Weenig informed the employees of "Georgie Porgie Shoppes of California", a subsidiary of G. P. International, that "Mr. Wood had embezzled and that he had cheated and that he had lied. . . . [A]nd that there was enough in substance there that if they wanted to turn around and throw him in jail, they could throw him in jail." Such comments by Weenig were, by one account, "just picked out of the blue sky sometimes . . . several times." In the spring of 1971, Weenig informed John Wilkinson, a friend of Plaintiff's son and a part-time Markway Press employee, that "Mark had some hidden accounts, or some accounts, bank accounts, and that he was an embezzler and a crook." On March 22, 1971, long after Wood left Markway because of the events of February 19, Weenig explained

---

2. Weenig does not take issue with the general rule that "[e]very repetition of the defamation is a publication in itself," Prosser, *supra*, at 768, thus making each occasion in which Weenig reiterated the defamations to a third party independently actionable.

to Internal Revenue agents that Markway Press' back taxes were unpaid because Wood had seven different bank accounts. Finally, on March 4, 1971, Weenig as President of Markway sent a letter to the company's creditors offering to pay $.20 on the dollar with the implication that there were insufficient funds to pay debts in full because of misfeasance by the prior management.

Wood claimed that extensive injuries resulted from the above asserted defamations. Since we hold that the jury could have properly found Weenig's accusations to be defamatory *per se, see* part VI A, below, and hence actionable without proof of special damages, *Hotel & Restaurant Employees & Bartenders International Union* v. *Julie's Restaurant* (1968), 142 Ind. App. 242, 253, 233 N.E.2d 784, 790, we reserve for the section on damages, part VIII below, our discussion of the issues presented by Weenig's challenges to Wood's proof of the injuries claimed.

At the outset of our evidentiary review, we reiterate the maxims that we do not adjudge credibility or reweigh the evidence on appeal, but must affirm if the verdict is supported by substantial evidence of probative value to establish each material element of the claim.

## A.  JURY COULD HAVE FOUND LANGUAGE DEFAMATORY

Weenig's first attack on the sufficiency of the evidence to support the verdict, that Wood failed to show that the language used was defamatory, is without merit. Weenig's oft-repeated accusation that Wood had embezzled funds from Markway Press was defamatory *per se* in that it imputed to Wood the commisson of a crime. *Hotel & Restaurant Employees & Bartenders International Union* v. *Julie's Restaurant, supra.* In the sense that such remarks obviously impugned Plaintiff in his trade or business, the statements are also defamatory *per se. Big Wheel Restaurants, Inc.* v. *Bronstein* (1973), 158 Ind. App. 422, 302

N.E.2d 876; *Henderson* v. *Evansville Press, Inc.* (1957), 127 Ind. App. 592, 142 N.E.2d 920. The jury obviously believed the testimony that Weenig made these remarks about Wood. We cannot do otherwise.

### B.   PLAINTIFF NEED NOT SHOW "MALICE" AS PREREQUISITE TO RECOVERY

Weenig contends that Wood failed to demonstrate liability because Wood failed to show "malice" on the part of Weenig. The argument must fail. Proof of "malice" is not a pre-requisite to the right of recovery in a defamation action. As this court pointed out in *Hotel & Restaurant Employees & Bartenders International Union* v. *Julie's Restaurant, supra,* 142 Ind. App. 254, 233 N.E.2d at 791:

> "Malice is not an element of a cause of action for defamation, and its existence remains important only where the exercise of a qualified privilege is in question, or to affect the measure of punitive damages to be imposed."

*See also* Prosser, *Law of Torts* 771-772 (4th ed. 1971) ; 1 Harper & James, *The Law of Torts,* 451 (1956). Since the question of Weenig's mental state, i.e., whether he was "malicious", is properly relevant only to the questions of qualified privilege and punitive damages, we reserve our treatment of the question for our treatment of those issues.

### C.   NO ABSOLUTE PRIVILEGE APPLICABLE

Weenig's argument that the evidence did not permit the jury to find him liable because of the existence of an absolute privilege must fail. One writer notes only six areas in which courts have recognized an absolute privilege: (1) "Judicial Proceedings"; (2) "Legislative Proceedings"; (3) "Executive Communications"; (4) "Consent of the Plaintiff"; (5) "Husband and Wife"; and (6) "Political Broadcasts". Prosser, *supra,* § 114, pp. 777-785; *see also,* Restatement of Torts, §§ 583-92, pp. 219-41 (1938) ; 1 Harper & James, *supra,* §§ 5.22-5.24, pp. 421-35; Fleming,

*The Law of Torts,* ch. 22, § V, pp. 525-537, (2d ed. 1965). Even were we to view all of the above listed absolute privileges in their broadest possible outlines, we would be hard pressed to hold any of Weenig's defamations within their scope. Defendant does not seriously argue that we could.

## D. JURY COULD HAVE FOUND WEENIG UNPROTECTED BY QUALIFIED PRIVILEGE

In his appellant's brief, Weenig relies upon a qualified privilege which "occurs in situations where communication made in good faith on any subject matter in which the party making the communication has an interest or in reference to which he has a duty either public or private, either legal, moral, or social, if made to a person, or persons, having a corresponding interest or duty." While the thrust of this qualified privilege is clearly of common law origins, *see, e.g.,* Prosser, *supra,* at 789, Weenig attempts to raise for the first time in his reply brief the contention that his statements were protected by a conditional privilege based upon the First Amendment to the federal Constitution, relying on the Third District's decison in *Aafco Heating & Air Conditioning Co.* v. *Northwest Pub. Co.* (1974), 162 Ind. App. 671, 321 N.E.2d 580, which was handed down after Wood filed his appellee's brief. While we recognize that Ind. Rules of Procedure, Appellate Rule 8.4(B) authorizes the filing of "[a]dditional authorities in support of any proposition stated in the briefs . . .", this rule does not extend to the filing of additional arguments so as to change "settled . . . practice that questions not raised or discussed in appellant's original brief cannot be presented in appellant's reply brief." *State* v. *Marion Cir. Court* (1958), 238 Ind. 637, 645, 153 N.E.2d 327, 330. *See also, Saloom* v. *Holder* (1974), Ind. App., 307 N.E.2d 890; *Flick* v. *Simpson* (1970), 145 Ind. App. 698, 255 N.E.2d 118; *Guy* v. *Universal Atlas Cement Co.* (1968), 143 Ind. App. 318, 240 N.E.2d 497. Adherence to the "settled practice" is particularly appropriate

in this case since "[o]ne reason for that rule is that the appellee has no opportunity to answer to a reply brief", *Flick v. Simpson, supra,* 145 Ind. App. at 710, 255 N.E.2d at 119, and it would be at best intemperate to speak to the complex constitutional questions belatedly raised with only one side of the issues argued.[3] We therefore consider only Weenig's claim of a qualified common law privilege.

Wood's response to Weenig's assertion of conditional privilege is two-fold: (1) the privilege asserted did not exist as to certain of the utterances shown, and that those unprivileged utterances alone provide a basis for the verdict, and (2) as to any occasion upon which the privilege existed, there was evidence from which the jury could have found the "actual malice" necessary to defeat the privilege.

The rule of qualified privilege upon which Weenig relies has long been recognized in Indiana. In *Indianapolis Horse Patrol, Inc. v. Ward* (1966), 247 Ind. 519, 524, 217 N.E.2d 626, 628-29, the court held that:

"The rule is well stated in 18 I.L.E. Libel and Slander § 52, pp. 475-476, as follows:

'The rule concerning a qualified privilege is that a communication made in good faith on any subject matter in which the party making the communication has an interest or in reference to which he has a duty either public or private, either legal, moral, or social, if made to a person having a corresponding interest or duty, is priviledged.' "

This rule of privilege encompasses what is sometimes called the "Common Interest" privilege, and the privilege which exists for the "protection of Interest of Recipient or a Third Person". Restatement of Torts §§ 595, 596, *supra;* Prosser, *supra,* at 789; 1 Harper & James, *supra,* at 441-442. The privilege has been recognized in the earliest of applicable Indiana

---

3. Those interested in a considered analysis of these problems are referred to Eaton, *The American Law of Defamation Through Gertz v. Robert Welch, Inc. and Beyond: An Analytical Primer,* 61 Va. L. Rev. 1349, 1403-1408, 1412-1419 (1975).

cases, *Coombs* v. *Rose* (1846), 8 Blackf. 155, and discussed at length by our courts on numerous occasions. *See, e.g., Gibson* v. *Kincaid* (1966), 140 Ind. App. 186, 221 N.E.2d 834; *Cadle* v. *McIntosh* (1912), 51 Ind. App. 365, 99 N.E. 779.

Weenig clearly acted under the protection of this privilege, at least *prima facie,* in his talks to his fellow Markway Press Directors on February 17 and 19. *Indianapolis Horse Patrol, Inc.* v. *Ward, supra; Kleizer* v. *Symmes* (1872), 40 Ind. 562; *Coombs* v. *Rose, supra; Cadle* v. *McIntosh, supra; Henry* v. *Moberly* (1898), 23 Ind. App. 305, 51 N.E. 497; *Henry* v. *Moberly* (1893), 6 Ind. App. 490, 33 N.E. 981. On the other hand, it is just as clear that the privilege did not apply to Weenig's statements to Robert Wells and the employees of Georgie Porgie Shoppes of California, persons who were not employed by or financially interested in Markway Press or Guideways and who therefore did not possess such a mutuality of interest with Weenig or protectible interest as would invoke the conditional privilege. See Prosser, *supra,* at 791, wherein it is stated that "[i]n all such cases, however, the privilege is lost if the defamation goes beyond the group interest, or if publication is made to persons who have no reason to receive the information." *See also* 1 Harper & James, *supra,* at 445; Fleming, *supra,* at 453.

Weenig's publications to John Stamm, John Wilkinson, the IRS agents and the Markway Press customers are not so readily subject to categorization. The *prima facie* applicability of the claimed privilege to these occasions is arguable. All of these persons shared with Weenig *some* financial interest in Markway Press but none of their interests approached the level of interest held by directors of the company. *See* Restatement of Torts, comments. b. and c. to § 596, *supra.* We need not, however, decide these close questions of privilege, or whether the two unprivileged defamations would be sufficient of themselves to warrant the damages awarded by the jury, because there was evidence presented from which the

jury could have found the "actual malice" necessary to defeat the qualified privilege as to any utterance made.

The general rule is that "actual" or "express malice" must be shown by the plaintiff to defeat a claim of qualified privilege. *Coombs* v. *Rose, supra,* 8 Blackf. at 157. "Actual malice" is often spoken of in terms of " '. . . motives of personal spite or ill will'," *Henry* v. *Moberly, supra,* 6 Ind. App. at 495, quoting *Klinck* v. *Colby,* 46 N.Y. 427, 7 Am. Rep. 360, or ". . . 'an evil and malignant desire to degrade and injure,' " *Kleizer* v. *Symmes, supra,* 40 Ind. at 571, quoting *Dial* v. *Holter,* 6 Ohio St. 228. But the essence of the concept is not the speaker's spite but his abuse of the privileged occasion by going beyond the scope of the purposes for which the privilege exists. As stated by the court in *Henry* v. *Moberly, supra,* 6 Ind. App. at 497:

"The word malicious 'Denotes merely the absence of lawful excuse; in fact, to say that defamatory words are malicious in that sense, means that they are unprivileged; *not employed under circumstances which excuse them.*' " (Emphasis supplied)

*Accord,* 1 Harper & James, *supra,* at 452-453; Prosser, *supra* at 792-795; Fleming, *supra,* at 547-549; *cf.* Restatement of Torts, *supra,* § 599. Thus, in *Over* v. *Schiffling* (1885), 102 Ind. 191, 192-193, 26 N.E. 91, dealing with a communication to a prospective employer of plaintiff, the court held that:

"The letter was not a privileged communication. The information it professes to contain was volunteered, and *the purpose for which it was conveyed to the appellee's employer was solely for the benefit of the writer, and was not intended to benefit the employer by giving him in good faith and for a just purpose, information necessary for his protection* against a knavish servant." (Emphasis supplied).

Applying the principles outlined above to the *prima facie* privileged defamations, the jury had sufficient evidence to conclude that Weenig abused and therefore lost the privilege on the privileged occasions. Weenig's remarks to the IRS agents, John Wilkinson, and customers of Markway Press (in

Wilkinson's case defamatory because imputing a crime to Wood and in all three cases defamatory because implicitly impugning Wood's conduct of Markway business) could have been viewed by the jury as "malicious" because tantamount to attempts by Weenig to shift the blame from himself, as current president of Markway Press, to Wood for the company's inability to pay its debts to these persons. *Big Wheel Restaurants, Inc.* v. *Bronstein* (1973), 158 Ind. App. 422, 302 N.E.2d 876, 880.

As to Weenig's statements to the Markway Press Directors at the February 19 meeting, his statements to John Stamm in Salt Lake City in mid-February, and his remarks to John Wilkinson in the late spring of 1971, the jury could have found "actual malice" on the part of Weenig in the sense of actual ill will towards Wood. In *Kleizer* v. *Symmes, supra,* 40 Ind. at 571, in discussing a church member's qualified privilege to discuss with other members of the congregation the character of the plaintiff church member relative to the plaintiff's continued fitness for church membership, the court stated:

> "He cannot shield himself, under the cover of church privilege, from an intentional and wilful attack upon another's character, under pretence of inviting a religious inquiry into the charges he makes. . . . It thus becomes a question of fact for the jury to decide, whether the defendant in preferring the charge was governed by a sense of Christian duty and his obligations to the rules of the church, or whether those pure and commendable principles were disregarded by him, and an evil and malignant desire to degrade and injure his neighbor permitted to control his action."

It has been noted that ". . . the vehemence of his language may be evidence against him in this respect." Prosser, *supra,* at 795

In his remarks to the directors on February 19, and to Stamm and Wilkinson, there was evidence of vehemence, which, coupled with the damning charges of embezzlement, dishonesty, and assertions of Weenig's supposed ability to

send Wood to jail, could have formed the basis of a reasonable belief that Weenig actually bore ill will towards Wood on these occasions. Further, such factors could well have persuaded the jury that Weenig acted in breach of "[t]he condition attached to all such qualified privileges . . . that they be exercised in a *reasonable manner* and for a proper purpose." Prosser, *supra*, at 792 (emphasis supplied) ; *see also*, Fleming, *supra*, at 537; 1 Harper & James, *supra*, at 454-455. Though the evidence of such "malice" in Weenig's remarks to the directors on February 17 is less substantial than as to the other occasions noted above, the jury may well have been able to infer the requisite abuse of privilege on that occasion as well.

Evidence of a different sort than that mentioned above provides the basis for an inference of "actual malice" on the part of Weenig as to all of the occasions. The general proposition that a conditional privilege is lost when the speaker utilizes the occason for an improper purpose, or otherwise goes beyond the scope of the purpose which justifies the privilege's existence, encompasses the principle that "since there is no social advantage to the publication of a deliberate lie, the privilege is lost if the defendant does not believe what he says." Prosser, *supra*, at 795; *see also*, Restatement of Torts § 600, *supra*; 1 Harper & James, *supra*, at 452. Similarly, "recklessness is treated as equally inexcusable," Fleming, *supra*, at 550, because "no reasons of policy can be found for conferring immunity upon the foolish and reckless defamer who blasts an innocent reputation without making any attempt to verify his statements. . . ." Prosser, *supra*, at 795; *see also, Chambers* v. *Leiser* (1906), 43 Wash. 285, 86 Pac. 627; *Royal Aquarium* v. *Parkinson* (1892), 1 Q.B. 431. The jury was presented with evidence tending to show a loss of qualified privilege on these grounds.

Weenig's accusations that Wood had embezzled funds from Markway Press, Inc., were based upon Wood's drawing upon

funds deposited by himself and Stamm in the Utah and California "Guideways" checking accounts. As our recitation of the facts has indicated, Weenig knew of the general practice whereby buyers of the brochures would pay Wood or some other Guideways salesman directly. Weenig also knew prior to the defamations that, of the funds in such accounts, Markway Press, Inc., was entitled to only 60%, the remainder being funds of Guideways, or Mark Wood Associates. Weenig also knew that Wood was developing business for Guideways (and derivatively for Markway Press) in Utah and California. Prior to the defamations, Wood had voluntarily supplied Weenig and the latter's accountant with *all* of the informtaion relative to the accounts in question. This information showed that Wood had never withdrawn funds in excess of the 40% of gross receipts to which he, doing business as Guideways or Mark Wood Associates or M. A. Wood Co., was undisputedly entitled. From this evidence the jury could have properly inferred that if Weenig had made *"any* attempt to verify his statements," Prosser, *supra,* at 795 (emphasis supplied) he would have learned that his charges were false. Such recklessness hardly comports with the requirement of "good faith" included in Weenig's own statement of the conditional privilege which he claims protects him.

To the circumstantial evidence of the recklessness or deliberateness of Weenig's misstatements must be added the testimony of Byron Larson, Weenig's own accountant. Larson stated that he overhead much of Weenig's conversation with Robert Wells in early February of 1971. Larson testified that, after the discussion had ended:

"Mr. Weenig came out of the front door of the office and came into the hall. I was a little alarmed so I went to the front door of my office I was occupying and called him over to the door. He came to the door and I said, 'You had better watch using words such as embezzler and crook. *We can't prove anything like that.* Things like that could cause you problems.' He said, '*Yea, I guess you are right, I prob-*

*ably lost my temper. I shouldn't have said that.' "* (emphasis supplied)

Despite his response to Larson's warnings, Weenig repeated the same accusations to several new audiences.

The trial court submitted to the jury all issues related to whether Weenig's defamations were protected by his assertion of a qualified privilege. We could state that Wood's proof demonstrated "actual malice" on the part of Weenig, thus defeating the privilege, or that Weenig's proof failed to show that the claimed privilege applied to the defamations published. Regardless which approach is taken, the evidence supports the verdict vis-a-vis Weenig's claim of common law qualified privilege.

### E. DEFENSE OF JUSTIFICATION NOT SHOWN

Weenig's final attack on the evidentiary basis of the verdict as to liability is his contention that his remarks about Wood were "justified" because "true". Weenig had the burden of proof on this issue of fact since "truth" is an affirmative defense to an action for defamation. *Hallowell* v. *Guntle* (1882), 82 Ind. 554; *Tull* v. *David* (1866), 27 Ind. 377. In this respect Weenig therefore appeals a negative judgment reversible only if contrary to law. *House* v. *Lesow* (1975), 167 Ind. App. 449, 339 N.E.2d 86. In other words, we must find that *no* reasonable trier of fact could conclude other than that Weenig's accusations were true. We cannot so hold. Even if Markway Press had such an interest in the funds in the Guideways accounts so that unwarranted drawing upon those accounts would be tantamount to embezzlement from Markway Press, Inc., Wood never withdrew more than the 40% of such funds to which he, as "Guideways", was entitled. The verdict is not contrary to law.

### VII.
### NO ERROR SHOWN AS TO INSTRUCTIONS

Weenig asserts that the trial court gave certain allegedly misleading or insufficient preliminary instructions. Having

failed to timely object to the giving of these instructions in the court below, Weenig has waived any error. Tr. 51(A) ; *Cochrane* v. *Lovett* (1975), 166 Ind. App. 684, 337 N.E.2d 565.

Weenig complains of the trial court's refusal to give three of his tendered final instructions. After asserting that such refusal constitutes reversible error, and listing the three instructions, Weenig makes only the following "argument" in his appellant's brief:

> "Instructions should be brief, accurate, conversational, and insofar as possible, non-technical. *Blair-Baker Horse Co.* v. *First Nat'l. Bank of Columbus* (1905), 164 Ind. 77, 72 N.E. 1027."

Appellant's cryptic recitation of a general legal principle, without any attempt to relate the rule to the refused instructions, falls far short of the requirement of AP. 8.3(A)(7) that:

> "Each error assigned . . . shall be set forth specifically and followed by the argument applicable thereto. . . . The argument shall contain the contentions of the appellant with respect to the issues presented, the reasons in support of the contentions along with citations to the authorities, statutes and parts of the record relied upon, and a clear showing of how the issues and contentions in support thereof relate to the particular facts of the case under review."

We must therefore deem the error, if any, "waived". AP. 8.3 (A)(7) ; *Kerkhoff* v. *Dependable Delivery, Inc.* (1975), 167 Ind. App. 248, 338 N.E.2d 513; *Citizens Nat'l. Bank of Grant Cnty.* v. *Harvey* (1975), Ind. App., 334 N.E.2d 719.

## VIII.

### SUFFICIENT EVIDENCE TO SUPPORT JURY'S AWARD OF DAMAGES; TRIAL COURT ERRED IN REDUCING SIZE OF THAT AWARD

Because of the interrelationship of Weenig's contention that the evidence does not support the award of *any* damages,

and Wood's assertion in his cross-appeal that the trial court erred in reducing the jury's award, our discussion of these points is consolidated. Three possibilities exist. Either (1), as Weenig contends, the evidence is insufficient to support the award of *any* damages; or (2) as Wood asserts, the evidence supports the jury's award of $150,000 compensatory damages and $50,000 punitive damages and the trial court erred in reducing that award to $25,000 actual damages and $5,000 punitive damages and entering judgment for that reduced amount; or (3), as Weenig argues alternatively, the court below properly found the jury's award to be "excessive" and its reduction thereof and entry of judgment for the lesser amount was not error. We hold that the evidence justified the verdict. We further hold that the trial court committed reversible error in reducing the jury's award.

We need not tarry long with Weenig's argument that the award of any damages to Wood is unjustified. Wood's evidence having permitted the jury to find Weenig liable for publishing communications which were defamatory *per se,* the jury could award "general damages" for "the harm which normally results from such a defamation." Restatement of Torts, *supra,* § 621; *see also, Dean* v. *Miller* (1879), 66 Ind. 440, 445; *Yeates* v. *Reed* (1838), 4 Blackf. 463, 464. Further, Wood's evidence of "actual malice" on Weenig's part permitted an award of punitive damages. *Meyer* v. *Bohlfing* (1873), 44 Ind. 238, 239-240; *Big Wheel Restaurants, Inc.* v. *Bronstein, supra,* 302 N.E.2d at 880. Hence, even apart from Wood's claim of special damages, the evidence permitted an award of *some* damages.

The debate over the proper amount of actual damages is essentially a dispute over the sufficiency of Wood's evidence of special damages. The "special damages" component of the "actual damages" possible in a defamation action, unlike the other component of "general damages", are *not* presumed but must be proven to have been

actually incurred "as a natural and proximate consequence of the wrongful act. . . ." *Miller* v. *Long* (1956), 126 Ind. App. 482, 497, 131 N.E.2d 348, 355; *see also, Gibson* v. *Kincaid, supra,* 140 Ind. App. at 196, 221 N.E.2d at 841 (Faulconer, J., concurring) ; *Aufderheide* v. *Fulk* (1916), 64 Ind. App. 149, 112 N.E. 399; Restatement of Torts § 622. Weenig's position is that Wood failed to show that the pecuniary losses which he incurred, in the form of lost income for 1971 and 1972, and lost investment in Markway Press, would not have occurred but for the defamations. Weenig contends that Markway Press' ultimate failure would have occurred in any event, because of the company's financial instability, and that therefore Wood would have suffered the business losses he claims regardless of any defamation. Weenig speculates that the trial court agreed with him and thus reduced the actual damages to exclude Wood's business losses.

Wood replies that evidence allowed the jury to find that Markway Press would not have failed but for Weenig's mismanagement and/or appropriation of the company's physical assets for his own use *after* Wood was "forced out of the business" by the defamations. Thus Wood argues that the jury could have found that his $62,000 of lost income, and $308,789 of lost investment in Markway,[4] were caused by Weenig's defamatory publications. Wood also asserts that since the jury's award of actual damages was thus within the scope of the evidence, the trial court erred in reducing that award.

Before examining the evidence as to the "proximate cause" of Wood's pecuniary losses, we must first determine the scope of the trial court's authority to effectuate its own view of that evidence by varying the jury's award, and the scope of our review of the exercise of that authority. Wood would have

---

4. $308,789 is the sum of amounts actually paid into Markway by Wood. Plaintiff acknowledges that the valuation of Markway's debts to him at face might be unrealistic, and suggests an alternative valuation of $143,000, being his equity in the company. Considering "general damages", *either* valuation would permit $150,000 actual damages.

us hold the trial court's authority in this regard to be severely limited in deference to the guarantee of Art. 1, § 20 of the Indiana Constitution that "[i]n all civil cases, the right of trial by jury shall remain inviolate." Weenig urges a more sweeping view of the trial court's power, asserting that the trial judge acts as a "thirteenth juror" with a vote so much weightier than his counterparts on the actual jury that the court's decision to reverse the jury on the evidence is entitled to a strong presumption of correctness on appeal, reversible only for an abuse of discretion. *See Memorial Hospital of South Bend, Inc.* v. *Scott* (1973), 261 Ind. 27, 300 N.E.2d 50; *Bailey* v. *Kain* (1963), 135 Ind. App. 657, 192 N.E.2d 486.

Wood first argues that the court below erred in reducing the size of the jury's award and granting judgment for that reduced amount, as opposed to granting a new trial to Plaintiff subject to remittitur. Wood contends that only the latter option is authorized by TR. 59(E)(5), which states that:

"(E)  Relief granted on motion to correct errors. The court, if it determines that prejudicial or harmful error has been committed, shall take such action as will cure the error, including without limitation the following with respect to all or some of the parties and all or some of the issues:

\* \* \*

(5)  In the case of excessive or inadequate damages, enter final judgment on the evidence for the amount of the proper damages, grant a new trial, or grant a new trial subject to additure or remittitur; . . ."

We disagree with Wood. The *form* of relief granted by the court below, in response to the specification in Weenig's motion to correct errors that the jury's award was "excessive", was not unauthorized by TR. 59(E)(5).

The precise wording of TR. 59(E)(5) itself indicates the permissability, in a proper case, of a trial court's reduction or increase of the jury's award, and entry of judgment for the new amount, without giving the verdict-winner the option of a new trial. The rule

itself lists *in seratim* what might be considered three distinct options available to a trial judge who has determined the jury's award of damages to be "improper" because excessive or inadequate. In such a case the judge could "[1] enter final judgment on the evidence for the amount of *proper* damages, [2] grant a new trial, or [3] grant a new trial subject to additur or remittitur." (Emphasis supplied).

The decision of the Third District of this court in *Borowski* v. *Rupert* (1972), 152 Ind. App. 9, 281 N.E.2d 502 (trans. den.), also supports the notion that the trial court may, in a proper case, reduce or increase the jury's damages without granting a new trial. In construing the scope of a trial court's authority to grant relief under TR. 59 (E) generally, the court implied that the lower court's ability to correct the error without a new trial extends, where feasible, to all parts of TR. 59. This implication comports well with the text of the rule.

Further support for the trial court's authority to vary the jury's damages without granting a new trial to the verdict-winner can be found by analogy to this court's power to grant relief on appeal under Ind. Rules of Procedure, Appellate Rule 15 (N). In *State ex rel. Schmal* v. *Lake Sup. Ct., Rm. 3* (1975), 264 Ind. 73, 339 N.E.2d 58, 60, the Supreme Court stated that "the relief which we may grant under this rule [AP. 15 (N)] is coextensive with that which a trial court may grant when it acts upon a motion to correct errors. Ind. Rules of Trial Procedure, Trial Rule 59 (E)." In *Lesh* v. *Johnston Furniture Co.* (1938), 214 Ind. 176, 13 N.E.2d 708, the Supreme Court, acting under the predecessor statute to AP. 15 (N), *see* Burns Ann. Stat. § 2-3234, reversed and ordered the trial court to enter judgment for a fixed amount *different* than the amount awarded by the jury, without the option of a new trial to either the verdict-winner or verdict-loser. That this court has such authority is evidence that the trial court also has power to grant this form of relief.

Wood seeks to turn the decision in *Lesh* v. *Johnston Furniture Co., supra,* to his advantage by contending that the case must be restricted to its facts. Unlike this case, the sum in dispute in *Lesh* was a liquidated amount. Plaintiff asserts that it follows that a trial court's authority to change the damages given by the jury without allowing the party aggrieved by such change the option of a new trial is restricted to cases of liquidated damages. *Lesh* does not so state nor does any other case which we have been able to find.

The history of TR. 59 indicates an intent on the part of our Supreme Court to *not* restrict a trial court's authority under TR. 59(E)(5) to liquidated damage cases. TR. 59(A)(3), which states that "[e]xcessive or inadequate damages, amount of recovery or other relief" is a basis for granting a motion to correct errors, and TR. 59(E)(5), which describes the trial court's options in granting relief when it concludes that error under TR. 59(A)(3) has occurred, as proposed by the Civil Code Study Commission did not qualify the type of damages which could be viewed as "excessive or inadequate" by the word "liquidated". The legislature amended both TR. 59(A)(3) and (E)(5) to restrict the provisions' scope to "liquidated damages". *See* 4 Harvey & Townsend, *Indiana Practice: Rules of Procedure Anno.* 111 (1971). The Supreme Court excised the legislature's modification of the Study Commission's proposed TR. 59(A)(3) and (E)(5) in 1969. The obvious inference is that the Supreme Court intended the trial court's authority under TR. 59(E)(5) to extend to unliquidated damages situations.

Having determined that the form of relief granted Weenig by the trial court under TR. 59(E)(5) does not necessarily require reversal, we must next decide if this was a proper case for such relief. Wood contends that if the trial court can enter judgment for an amount different than that awarded by the jury, it may properly do so only when the jury errs as a matter of law in assessing damages. Wood reasons that where, as here, the evidence is such that reasonable persons could disa-

gree, the trial court must either let the verdict stand, grant a new trial or condition any other relief with the option of a new trial. To hold otherwise, Wood asserts, violates the common law right of trial by jury of issues of fact, and hence Art. 1, § 20 of our Constitution which guarantees that right remain inviolate. Weenig counters that the trial court may constitutionally go further and enter the fact-finding realm as a "thirteenth juror" with the power to veto this jury's decision, *and* remove the issue from a future jury, if it concludes that the preponderance of the evidence is against the verdict.

The "thirteenth juror" principle was articulated in *Bailey* v. *Kain, supra,* 135 Ind. App. at 665-666, 192 N.E.2d at 489-90, as follows:

> ". . . [W]*hen confronted with a motion for a new trial . . . ,* it is the duty of the trial judge to insure that substantial justice is done by the verdict of the jury. The duty thus imposed as stated hereinbefore requires that the judge attentively review, consider and weigh the evidence presented during the trial. Such a mandate places upon him (the trial judge) the duty of observing and noting all of the indicia of truth and falsehood surrounding the witnesses at the trial together with all of the surrounding circumstances about which they testified and thereupon to determine the credibility of the various witnesses and the weight to be accorded their testimony. All of such factors must conscientiously occupy the judge's attention *on a motion for a new trial* and he should exercise them with 'careful deliberation' in his determination of the question of the preponderance of the evidence, and *if in the judge's opinion, the evidence preponderated against the verdict of the jury it is his imperative duty to grant a new trial* for the party seeking such relief." (Emphasis supplied)

*See also, Memorial Hospital of South Bend, Inc.* v. *Scott, supra; State* v. *Bowling* (1970), 253 Ind. 634, 256 N.E.2d 392; *State Farm Life Ins. Co.* v. *Spidel* (1964), 246 Ind. 458, 202 N.E.2d 886; *Novak* v. *Chicago & Calumet Dist. Transit Co.* (1956), 235 Ind. 489, 135 N.E.2d 1. As the emphasized portions of the language quoted from *Bailey* v. *Kain, supra,* indicate, the "thirteenth juror" principle was designed to

apply to the trial court's decision to grant *a new trial.* Here no new trial was granted.

We have discovered no case in which this court or our Supreme Court followed the "thirteenth juror" rule, thus according to the trial court's action "a *strong* presumption of correctness", *Memorial Hospital of South Bend, Inc.* v. *Scott, supra,* 300 N.E.2d at 53 (original emphasis), when the relief given by the trial court contrary to the verdict, consisted of correcting the supposed error *without* permitting a new trial. This is not mere coincidence. If our guarantee of the right of jury trial in civil cases is to have any meaning, the rule of *Bailey* v. *Kain, supra,* cannot be applied when the verdict-winner is not given the choice of a new trial in lieu of the trial court's judgment contrary to the jury. The better rule for cases in which no new trial is possible is that if the jury's verdict is within the scope of the evidence it must be upheld unless, as in the case of a TR. 50 judgment on the evidence, the verdict is erroneous as a matter of law.

A case upon which the decision in *Bailey* v. *Kain, supra,* was based is *Novak* v. *Chicago & Calumet Dist. Transit Co., supra.* In the course of its opinion, the Supreme Court in *Novak* reiterated the " '. . . [t]he general rule . . . that a peremptory instruction [directed verdict, now a TR. 50 judgment on the evidence] may be given when there is a total absence of evidence or legitimate inferences in favor of the plaintiff upon an essential issue or where the evidence is without conflict and is susceptible of but one inference and that inference is in favor of the defendant. * * *' " 235 Ind. at 496, 135 N.E.2d at 4. Then the court stated that:

> "The rule above stated is grounded upon the fact that Article 1, § 20 of the Constitution of Indiana guarantees that, 'In all civil cases, the right of trial by jury shall remain inviolate.' Therefore, if there is any evidence of probative value in support of the necessary issues drawn in the case, it is the constitutional right of the complaining party, in cases triable by jury, to have a jury determine the credi-

bility of the witnesses and the weight that shall be given the evidence and to decide the facts accordingly. But this does not mean that a defendant is without recourse against a verdict which is not sustained by the clear weight of the evidence. *In such an event it is the duty of the trial judge,* who also saw the witnesses and heard the evidence from their lips, on proper motion *to order a new trial of the cause.*

\* \* \*

Thus it is that a *complaining party, whose case is supported by some evidence of probative value upon every material issue, is given the benefit of his constitutional guarantee to have the right which he asserts finally affirmed or denied by a qualified and impartial jury.* Thus also it is that a party-defendant is protected against the errors of a jury by the trial judge, whose duty it is to review the entire proceedings in the cause, and, in the light of his greater experience and understanding of the law, either affirm or reject the verdict of the jury." 235 Ind. at 497-498, 135 N.E.2d at 5. (Emphasis supplied).

Where, as here, the trial judge modifies the verdict as to damages without giving the party aggrieved by his modification the option of a new trial, the judge has in effect taken the damages issue from the jury and tried it himself. The party aggrieved by the court's modification of the verdict has no opportunity to have his rights on that issue "finally affirmed or denied by a qualified and impartial jury." *Ibid.* If that party had presented "some evidence of probative value" upon that issue, and had properly moved for a jury trial thereon, he is *denied* "the benefit of his constitutional guarantee. . . ."

It has been stated that "the trial judge's power [under the "thirteenth juror" rule] is not exercised in derogation to the right to trial by jury. Indeed, he serves as a safeguard of that right by warranting that the jury system does not become a whimsical tool without restraint." *Memorial Hospital of South Bend, Inc.* v. *Scott, supra,* 300 N.E.2d at 54. The right may be safeguarded when the party claiming it is given a second opportunity to assert it when, in the view of the trial judge, injustice has resulted from the first exercise of the

right. But a party's right is hardly preserved by its total deprivation.

Recent interpretation of our Constitutional right of jury trial in civil cases impliedly supports our view that, while a trial judge can act as a "thirteenth juror" and order a new trial when convinced that the evidence preponderates against the verdict, he may properly enter an absolute judgment different from the verdict only when convinced that the verdict is erroneous as a matter of law. In *Borowski* v. *Rupert, supra,* 152 Ind. App. at 12-13, 281 N.E.2d 503-504 n. 2, this court discussed the history of the common law right of trial by jury in civil cases at some length. The history there surveyed indicates to us that the "thirteenth juror" principle was designed for the limited situation in which a new trial by a new jury was granted " '. . . as a means of correcting the mistakes and relieving against the misconduct of juries . . .' " *Id., quoting Smith* v. *Times Publishing Co.* (1897), 178 Pa. 481, 36 A. 296, 308.

Additional support for our view of the inapplicability of the "thirteenth juror" concept to our facts can be found in the text of TR. 59 (E) (5) itself. As noted by Prof. Greenbaum in a 1969 address quoted in 4 Harvey & Townsend, *supra,* 149, at 152-53:

> "Trial Rule 59 (E) (5) provides that, 'in the case of excessive or inadequate damages' the court in appropriate cases may enter 'final judgment *on the evidence* for the amount of proper damages. . . .' The Reporter's Comments to the Proposed Draft stated that, 'It is now intended that the court is empowered to enter the final judgment fixing proper damages *when the evidence is clear and unrebutted* after the jury has committed error in assessing damages.' It seems clear on close reading that the rule merely implements the provisions of Trial Rule 50 for judgments on the evidence and is not an invitation to trial judges to weigh conflicting evidence on damages in jury trials and enter definitive judgments." (Original emphasis).

We agree with the import of the quoted commentator's conclusion that the court below could not have properly reduced

the jury's award and entered judgment for the reduced amount unless it could find that the damages were excessive *as a matter of law.*

The trial court erred in reducing the jury's award of actual damages because that award of $150,000 was within the scope of the evidence. The evidence is conflcting as to the cause of Markway Press' ultimate demise. There was evidence from which the jury could have inferred that the company was not in such dire financial straits as of the time of Wood's forced departure in February of 1971 that its collapse, and hence the loss of investment and income to Wood, was inevitable. For example, financial reports prepared in December of 1970 and January of 1971 indicated that Markway Press' 60% share of the accounts receivable for booklets sold would more than cover its share of its and Guideways' current operating expenses and payroll. There was also evidence that after Wood's departure, Weenig himself removed from Indianapolis certain of the physical assets of Markway necessary to its continued operation. The jury could properly have found Weenig's defamations to be the proximate cause of Wood's business losses and awarded Wood as much as $300,000 compensation in "special damages" therefor.

Nor was the jury's award of $50,000 punitive damages excessive *as a matter of law.* "Actual malice" on the part of Weenig having been shown, the jury was entitled to award Wood punitive damages. *Barker* v. *Prizer* (1897), 150 Ind. 4, 48 N.E. 4; *Big Wheel Restaurants, Inc.* v. *Bronstein, supra.* The purposes of such damages are to deter and punish. *Meyer* v. *Bohlfing* (1873), 44 Ind. 238; *Hibschman Pontiac, Inc.* v. *Batchelor* (1976), Ind. App., 340 N.E.2d 377. As one might suspect, "[i]t is usually held that the amount of exemplary damages lies within the discretion of the jury, subject to review by the court only in cases of such abuse as indicates the influence of passion or prejudice." McCormick, *Damages,* 296 (1935). Considering the evidence of actual malice and the purposes of punitive

damages, we cannot say as a matter of law that the jury's award was excessive as to indicate passion or prejudice.

We have already recited at length the ample evidence of "actual malice" on the part of Weenig. See Part VI, D., *ante*. We have noted also that Weenig repeated his defamatory charges on at least nine occasions, and that several of these *followed* Weenig's acknowledgement of Larson's warning that the charges could not be proved. Along these lines, it has been stated that "repetition of slanderous words may tend to impress the jurors that there was express malice, and thus augment the damages." *Binford* v. *Young* (1888), 115 Ind. 174, 179. Some courts have hewn a rough yardstick for measuring the propriety of a particular amount of punitive damages in light of the evidence: "[t]he punitive damages given . . . must bear some reasonable proportion to the actual damages." McCormick, *supra,* at 298. Even if this were the rule in Indiana, the punitive damages awarded by the jury were equal to one-third of the amount of actual damages properly awarded, a proportion more reasonable than that found not to be excessive in *Clark* v. *Kroger Co.* (7th Cir. 1967), 382 F.2d 562, wherein the punitive damages equalled the actual damages.[5] *See* McCormick, *supra,* at 298 n. 8. In short, the evidence permitted the jury to award the punitive damages which it did.

The judgment is affirmed to the extent that it holds Weenig liable to Wood. The judgment is reversed to the extent that the trial court awarded Wood damages different in amount than the damages awarded him by the jury. The trial court is ordered to enter judgment on the verdict in favor of Wood in the amounts of $150,000 actual damages and $50,000 punitive damages. *See* AP. 15(N); *Lake Mtg. Co., Inc.* v. *Federal Nat'l, Mtg. Assn.* (1975), 262 Ind. 601, 321 N.E.2d 556.

---

5. In *Murphy Auto Sales, Inc.* v. *Coomer* (1953), 123 Ind. App. 709, 112 N.E.2d 589, an award of punitive damages *greater* than the amount of actual damages was affirmed.

Buchanan, P.J. and White, J., concur.

NOTE.—Reported at 349 N.E.2d 235.