**Thomas J. TACKET, Plaintiff,**

v.

**DELCO REMY DIVISION OF GENER-AL MOTORS CORPORATION, Defendant.**

**No. IP 85–1398–C.**

United States District Court, S.D. Indiana, Indianapolis Division.

April 2, 1987.

M. Michael Stephenson, Shelbyville, Ind., for plaintiff.

Herbert C. Snyder, Jr., Barnes & Thornburg, Indianapolis, Ind., for defendant.

NOLAND, District Judge.

## ENTRY OF VERDICT AND JUDGMENT

This cause came before the Court for trial before a jury on February 17, 1987, during which testimony was given and evidence presented.

The defendant having moved for a directed verdict at the close of all of the evidence, the Court now, having reviewed the evidence, being duly advised in the premises and after due consideration hereby directs a verdict in favor of the defendant Delco Remy Division of General Motors and against the plaintiff, Thomas Tacket. In accordance with its Memorandum of Decision, the Court now DIRECTS A VERDICT and ENTERS JUDGMENT for the defendant.

IT IS THEREFORE ORDERED, ADJUDGED and DECREED that plaintiff take nothing by way of his complaint, and that a VERDICT and JUDGMENT BE ENTERED in favor of the defendant; with costs to be borne accordingly.

## MEMORANDUM OF DECISION

This cause presents the question of whether certain statements made by management level personnel at Delco Remy Division of General Motors regarding a Delco employee, Thomas Tacket, constitute defamatory publications entitling the employee to recover damages. The jurisdiction of this Court is based upon diversity of citizenship. 28 U.S.C. § 1332 (1982). The Court bifurcated the issues to be presented to the jury into the liability issue and the damages issue. The parties presented their testimony and evidence pertaining to the liability issue to the jury, and, at the close of all of the evidence, the Court granted the defendant's motion for a directed verdict pursuant to Rule 50. Fed. R.Civ.P. 50.

## I. FINDINGS OF FACT

The testimony and evidence presented at trial established the following facts.[1] Thomas Tacket ("Tacket"), the plaintiff in this case, was and remains an employee at Delco Remy Division of General Motors ("Delco") in Anderson, Indiana. Delco is a large manufacturing concern involving numerous plants (fifteen to twenty) and thousands of employees at its Anderson location. Delco employees are generally divided up into two categories unclassified—upper level management salaried personnel—and classified—ranging from lower level salaried management down to hourly personnel. Delco breaks its classified employees into two general subclasses:

a. *Level Employees:* these employees possess varying amounts of supervisory responsibility and generally are considered management personnel. The Levels are divided numerically from Level 5 to Level 8, with Level 8 serving as the highest ranking, classified category.

b. *Bargaining and Nonbargaining Employees:* Generally, these employees do not exercise supervisory/management-type authority, and they constitute lower levels of the employment hierarchy.

Delco first employed the plaintiff in January of 1971. The plaintiff rose through the Delco hierarchy, and in 1983, he was promoted to night superintendent in charge of all night operations for Plant 17. The plaintiff attained (and still retains) a Level 7 classification.

In February of 1985, Delco's Anderson facility, including Plant 17, was satisfying a significant production contract entitled the "9–S1 Project." A problem arose regarding the production or attainment of certain wooden shipping containers in connection with this project. Edward Spearman, a Level 6 foreman in Plant 17, contacted John Swan about the possibility of producing the aforementioned wooden containers in Plant 17. *Trial Transcript,* Vol. III, pp. 141–43. John Swan, then the general supervisor in charge of maintenance in Plant 17, *Trial Transcript,* Vol. II, p. 19, informed Spearman that Plant 17 was not interested in manufacturing the boxes. *Trial Transcript,* Vol. III, pp. 142–43. Subsequent to this exchange, the plaintiff testified that Swan approached the plaintiff informing him that Ken Tullis (Project Engineer) "was in trouble" regarding the containers and that Spearman was searching for an outside source (*i.e.,* outside of the Delco plant) to produce the containers. Vol. II, p. 22. Tacket testified that as a Level 8 supervisor, Swan was his superior, *id.* at 19, and that Swan "told [him] to make sure that the requisitions that [he] would be receiving late that evening" were completely filled out. Vol. II, p. 23. Swan's testimony on this matter substantially contradicted Tacket's testimony.[2] In addition, testimony established that Swan, instead of possessing a Level 8 classification superior to Tacket, was in fact a Level 7 supervisor identical to Tacket. Vol. II, pp. 96–97 and Vol. II, p. 141.

Tacket received the aforementioned requisition forms shortly before his shift ended that night. The two requisition forms provided for the purchase of 2000 wooden shipping containers from an "S & T Specialties, P.O. Box 581, Elwood, Indiana," having a total purchase price of $90,000. Although Tacket was not scheduled to work again until the following afternoon, Tacket returned to Delco Remy the follow-

---

1. In a federal court case premised upon diversity of citizenship, the ruling court must address the controlling state standard to determine whether a directed verdict is justified. *Chaulk by Murphy v. Volkswagen of America, Inc.,* 808 F.2d 639, 640 (7th Cir.1986). In Indiana, a trial court must construe the evidence and reasonable inferences therefrom in a light most favorable to the nonmovant. *Perry v. Leo P. Knoerzer Corp.,* 472 N.E.2d 223, 225 (Ind.App.1984). Accordingly, for the purposes of this order, this Court construes the facts and adopts all infer-

ences therefrom in a light most favorable to the plaintiff, Tom Tacket.

2. On direct examination, John Swan categorically denied speaking with Tacket regarding the shipping containers or the existence of a "hot" project. *Trial Transcript,* Vol. III, pp. 142–43. For the purposes of this decision, however, this Court assumes that such conversations took place.

ing morning and began to process the requisition forms. Vol. II, p. 24.

Tacket testified that he took the requisition forms to an assortment of Delco management personnel. First he took them to Roy Gore, an accountant, and then both he and Gore took the forms to Lyle Crouse, the plant manager of Plant 17. Upon presenting the forms to Crouse for his signature, Crouse refused to sign them, instructing Tacket to take the forms to another management person, Ken Tullis in Plant 1.[3] Vol. II, p. 26. Tacket then, by himself, took the forms to Tullis, and the two of them took the forms to Tullis' superior, Lloyd Ford. At Ford's request, Tacket signed the forms because "the originating plant needs to sign them." Vol. II, p. 27. As a result, the completed forms included Ed Spearman's signature as foreman, Tacket's signature both as supervisor of Ed Spearman and as the authorizing supervisor in the originating department, and the counter-signature of Lloyd Ford beneath Tacket's latter signature. Tacket, through the use of his own personal contacts, obtained a HERC (emergency project) stamp on the forms. Vol. II, pp. 30–32.

Subsequent testimony established that Tacket lacked the authority to sign a requisition form as an authorizing supervisor in the originating department. Vol. III, pp. 17–18. Moreover, Tacket admitted upon cross-examination that he had never signed that type of requisition form in a similar fashion. Vol. II, p. 97.

Approximately one month later, the local union bargaining group began complaining about the shipping container project authorized by the aforementioned requisition forms because the the project was "outsourced." Vol. II, p. 33. Evidence was uncovered to indicate that S & T Specialties was a company operated by Ed Spearman, and that Spearman was manufacturing the disputed shipping containers in his garage. Approximately March 26, 1985, a group of high ranking management met in Plant 1 to discuss the possibility of suspending Tacket in order to investigate his involvement with S & T Specialties, Vol. III, pp. 24–26 and Vol. III, p. 91. Two of Tacket's superiors in Plant 17 present at the meeting, Bruce Hornaday and Lyle Crouse, were instructed to question Tacket about his involvement with S & T. Vol. III, p. 91. This group directed Mr. Crouse and Mr. Hornaday, Tacket's immediate supervisors, to conduct an investigation into Tacket's employment status and activities. Vol. III, p. 91. Approximately two days later on March 28, a second meeting was held and the group concluded that the suspension of Tacket was necessary in order to conduct an investigation into the shipping containers transaction. Vol. III, pp. 91–93. Mr. Crouse and Mr. Hornaday were given a list of questions to ask Tacket prior to suspending him pending the investigation into his involvement with S & T Specialties.[4] Vol. III, p. 42. As a result of these events, the employment of Ed Spearman was terminated and the employment of Tacket was suspended with pay. Vol. II, p. 36.

The evidence established that various communications discussing the suspension of Tacket occurred on or shortly after March 28, 1985. A compendium of these communications, by individual witness, follows:

*Jack Huffman:* (Hourly, non-bargaining general foreman in Plant 17). March 29, a group of Plant 17 general foremen called to a meeting in order to notify them "ahead of the hourly ru-

---

3. Crouse testified on direct examination that he did not recall Gore accompanying Tacket into his office with the requisition form. Vol. III, p. 59. Moreover, Tacket admitted that Crouse stated to him that on March 28, 1985, Tacket was alone when he brought the requisition form for Crouse's signature. Vol. II, p. 33–34. For the purposes of this order, however, this Court accepts Tacket's trial version.

4. In addition to other reasons, management became suspicious of Tacket because of his close personal and working relationship with Ed Spearman. Vol. I, p. 96 and Vol. II, p. 29. In addition, the presence of both of their signatures on the requisition form to purchase goods from a mysterious "S & T" Specialties company, when combined with the established involvement of Spearman, suggested that the "S" stood for Spearman and the "T" for Tacket. Vol. II, pp. 34–35.

mors" that Tacket was "suspended pending an investigation into some illegal activity." Vol. I, pp. 37–39, the illegal activity being "the subject matter of the investigation." Vol. I, p. 56.

*David Stone:* (Manufacturing supervisor, Level 6, in Plant 3). Stone and some of his associates requested an explanation about Tacket from one of their superiors. Certain plant managers are subsequently called to a meeting in Plant 1 and told, "Spearman was discharged and Mr. Tacket was being investigated for how deeply he was involved with T & S [sic]." Vol. I, p. 68.

*Ron Swindell:* (Bargaining millwright in Plant 17; Spearman was his immediate supervisor). Mr. Flowers, a Level 7 or 8 supervisor called a meeting of a wide variety of employees and informed them that Spearman was terminated and Tacket "was also still suspended pending further investigation on his involvement with the misappropriation of the 813 [requisition form]." Vol. I, p. 94. Flowers refused to answer questions regarding what Spearman and Tacket had done. Vol. I, p. 93.

*Lyle Crouse:* (Plant manager, unclassified, Plant 17). Called a meeting of five Level 6, Plant 17, second shift supervisors and informed them that Tacket (one of their immediate supervisors) would not appear on the shift for awhile because he "has been suspended until we investigate further investigation around the S & T Industries or the box making operation." Vol. III, p. 26. Crouse further instructed them not to start any rumors. Vol. III, p. 27.

*John Maier:* (Machine repair journeyman, hourly union man, Plant 17).

Flowers, a Level 7 supervisor, called a meeting of Plant 17 hourly rated personnel and informed them that Spearman was terminated and Tacket was suspended "because something was wrong with the use of an 813." Vol. III, p. 83.[5] Maier testified that he had heard rumors regarding the scandal prior to the meeting. Vol. III, pp. 70–73.

*William Steinbrunner:* (Unclassified, director of quality materials and operation support). While attending a national meeting in Washington, D.C., Mr. Steinbrunner, when asked by a friend's wife whether Tacket had been suspended, answered affirmatively. Vol. III, p. 101.

■ As a result of these communications and various rumors both in and out of Delco Remy, it became common knowledge that Tacket was suspended for his possible involvement with Spearman in the shipping containers scheme. The ensuing investigation failed to uncover sufficient evidence to justify Tacket's dismissal, thus, Tacket was recalled to work. Shortly after his recall, Tacket was shifted from a general supervisor of manufacturing in charge of all night operations and personnel to an administrator of a quality improvement team. Vol. II, pp. 8–18. The transfer decreased neither Tacket's hierarchical status nor his level of pay. The transfer did, however, reduce the number of personnel subject to his supervision. Vol. II, pp. 10–14. In addition, Tacket testified that he suffered less favorable on the job performance ratings after the shipping containers calamity. Vol. II, pp. 42–51. Finally, Tacket testified that because he was not reachable on the first day he was recalled to active employment, he was requested to take that day as vacation. Vol. II, p. 40.[6]

---

**5.** For the most part, Mr. Maier's testimony lacked lucidity. As a result, this Court concludes that the above quotation, albeit the actual language of the defense counsel, accurately expresses the communication in question.

**6.** Tacket also testified that after the transfer to quality control, his "beeper" (remote notification/paging device) and his designated parking place were taken from him by his superiors.

Vol. II, pp. 67–71. Subsequent testimony established that Level 7 management employees, especially those with *de minimus* supervisory responsibility, possess neither a beeper nor a personalized parking place. Vol. II, pp. 82–84 and Vol. III p. 156. More importantly, however, although these events may have some obtuse relevance to a discrimination/harassment or wrongful transfer allegation, they are irrelevant in a suit for defamation against Delco Remy.

The evidence adduced at trial also established that on two separate occasions, signs were posted on the walls of Plant 17 reading "Tacket Tacket What a Racket." The first of these signs was quite large (thirty feet in length and five feet in height) and was relatively shortlived (2–3 days during Tacket's suspension). Vol. I, p. 47. The second sign was smaller (approximately one foot by one foot), was spray painted directly onto the painted cinder block wall in stenciled letters, and remained on the wall approximately seven months. Testimony established that although no one knew who painted the smaller sign, it was probably the product of the hourly personnel's satirical propensities. Vol. I, p. 60.

During the course of the trial, it became evident to the Court that the union initiated the company's investigation of Tacket and still maintains that he is responsible for the out-sourcing (the union having a strong motive for producing all items possible within the plant). The record contains many examples of the deterioration of Tacket's reputation, respect and relationship with hourly and union employees. Vol. I, pp. 62–63, Vol. I, pp. 72–73, Vol. I, p. 88, and Vol. III, pp. 68–70. In addition, the record is replete with examples of the bitter union animus toward Tacket that developed because of his potential involvement with the outsourcing, as well as his previous participation in union-management grievances. Vol. II, p. 33 (union initiates complaint against Tacket for the out-sourcing), Vol. II, pp. 63–66, Vol. II, pp. 111–14 (confrontation with union official), and Vol. III, pp. 169–70 (skilled trade and union employees demonstrate their enmity towards Tacket).

This friction had an adverse impact upon Tacket's ability to perform his supervisory functions as well as his ability to effectively function with supervised personnel. Vol. II, p. 78, and Vol. III, p. 169. This decreased effectiveness became apparent in his performance reviews. Vol. II, 49–50. In his final appraisal, after his ineffective-

ness became evident, Tacket expressed a desire to remove himself from in-plant, on-the-floor supervisory responsibilities to field jobs in which he would not have to supervise non-management Delco Remy employees. Vol. II, pp. 133–35.

The transfer Tacket encountered after his suspension removed him from a position of substantial personal supervision to a position of quality supervision (fewer supervisees). This transfer was discussed and set in motion prior to the time that Tacket was suspended. Vol. III, pp. 159–64. Moreover, the highest ranking Delco Remy employee examined testified that this transfer was precipitated by Tacket's decreased effectiveness and complaints from the night superintendent (Elmer Anderson), rather than the suspension itself. Vol. III, pp. 157–58, 162–64, 169–70, see Vol. I, p. 89 (after the transfer, Tacket had less contact with the lower level employees). Finally, even though management recalled Tacket to his employment and reinstated him, thereby officially clearing him of the allegations, both of the upper level management personnel that testified indicated that they were not certain that Tacket was entirely innocent. Vol. III, pp. 55 and 95–96.

## II. DISCUSSION

### A. *Truth of the Communications*

In Indiana, a statement defames a plaintiff when it (a) tends to injure the plaintiff's reputation, or (b) diminishes the esteem, respect, goodwill or confidence that others have in the plaintiff, or (c) tends to incite derogatory feelings or opinions about the plaintiff. The statements must, however, involve the concept of disgrace. *Shallenberger v. Scoggins–Tomlinson, Inc.*, 439 N.E.2d 699, 705 (Ind.App.1982). In order to recover in an action for defamation, the statements in question must be both false and defamatory. *Restatement (Second) of Torts* § 558(a) (1977). Truth is a complete and affirmative de-

---

Similarly, testimony that Tacket's telephone line was tapped, Vol. I, pp. 49–50, and Vol. II, pp. 75–80, not only lacked a connection to Delco Remy management, but is completely irrelevant

to a defamation action. In addition, it is likely that the phone was tapped for reasons unrelated to this case. Vol. II, pp. 81–85.

fense. *Elliot v. Roach*, 409 N.E.2d 661, 681 (Ind.App.1980). As a result, armed with the truth a defendant may, without impunity, publish "the facts for no good reason or for the worst possible motives ... even [if] he does not believe" the truth of the statements at the time. W. Keeton, D. Dobbs, R. Keeton, D. Owen, *Prosser and Keeton on Torts*, Chapter 19, § 116 at 840–41 (5th ed. 1984) (footnote omitted). Moreover, Delco Remy as an employer, incurs no liability for the publication of a defamatory statement by an agent or servant unless that agent or servant acted within the scope of his employment. 18 *Libel & Slander*, Ind. Law Ency., § 72 (1959); *Prosser & Keeton on Torts*, Chapter 19, § 113 at 801.

■ In this case, the defendant elicited testimony and produced evidence sufficient to establish that all of the allegedly defamatory statements were in fact true. As recounted above, all but one witness testified that the communication they witnessed which emanated from management was that Tacket had been suspended pending an investigation into his involvement with the shipping containers scandal. The parties do not contest the truth of this statement. Tacket was, albeit unwittingly, an instrumental player in the out-sourcing of the shipping containers, and his suspension resulted from this involvement. Tacket himself admitted that the facts available to management at the time not only warranted an investigation of him, but also justified his subsequent suspension. *Tacket*, Vol. II, pp. 97–99. This Court will not allow the plaintiff to recover for statements that he concedes were not only true, but reasonable.

The only statement that varies from this pattern in any way is the statement of John Maier, an hourly machine repair journeyman in Plant 17. Maier was called into a meeting by his General Supervisor, Dick Flowers, to discuss the fate of Spearman, Maier's immediate supervisor, and Tacket, who was Spearman's supervisor. Maier

provided a vague and somewhat equivocal recitation as to the communications occurring during that meeting.[7] Maier testified that they were told that Spearman was terminated and that Tacket was suspended "due to an 813 and some type of misappropriation of materials, as I understood it." Vol. III, p. 67. Maier testified, however, that he could not recall the exact words used. Vol. III, p. 81.

Evidence pertaining to the 813 forms, *i.e.*, requisition requests, indicated that these were merely the forms used to purchase goods from an outside source. Thus, the statements as recited by Maier are without meaning because a requisition request could not involve the misappropriation of Delco Remy materials. The gist of those statements, however, remains true. Tacket was suspended because of his involvement with certain impropriety surrounding the misuse of 813 requisition forms. Again, the impropriety did occur and Tacket's conduct facilitated the impropriety, albeit unwittingly; thus the statements themselves were true.

In addition, any statement is subject to innumerable interpretations. What is actually stated and what was understood are often entirely different. The law is well-settled "that words are to be taken in the sense in which they are reasonably understood under the circumstances, and are to be presumed to have the meaning ordinarily attached to them by those familiar with the language used." *Prosser & Keeton on Torts*, Chapter 19, § 111 at 781. In this case, the clear meaning of the statements presented to this Court as having been made by a Delco Remy agent in the scope of his employment was true even though the statements themselves may have had an unfavorable connotation. Thus, Delco Remy is not responsible for any unreasonable misinterpretation of these statements.

■ The plaintiff contends that the subsequent widespread and variegated rumors that eventually permeated Delco Remy and beyond were repetitions of Delco Remy's

---

7. Maier, in the course of cross-examination, demonstrated a demeanor inimical toward the company. Maier was also somewhat evasive and exhibited substantial resistance to defense counsel's cross-examination. *See* Vol. III, pp. 75–85.

original defamation, thus Delco Remy is liable for these "republications." *See Weenig v. Wood,* 169 Ind.App. 413, 430 n. 2, 349 N.E.2d 235, 246 n. 2 (1976). Generally, the original publisher is liable for any republication which is "the natural consequence of his act," but not a republication "which results from the independent and unauthorized act of another person." 18 *Libel & Slander,* Ind. Law Ency. § 43 (1959) (footnote omitted). In this case, each original publication expressed by management supervisory Delco Remy personnel was true; the witnesses did not allege that management accused Tacket of stealing from Delco Remy. Vol. I, p. 96. In addition, Delco Remy may not be held liable for any subsequent statements that distort the original truthful publications because such subsequent distortions constitute misinterpretations, not repetitions. Thus, the rumors circulating throughout Delco Remy and the city of Anderson which did not constitute accurate reiterations of the statements previously discussed could not constitute actionable republications traceable to Delco Remy. Furthermore, as pointed out above, neither the local union's actions or statements in protesting the outside procurement, nor any rumors resulting from the union's activities are attributable to Delco–Remy.

B. *Responsibility For The Wall Signs*

 Assuming, arguendo, that the "Tacket Tacket What a Racket" signs were both defamatory and false, the plaintiff failed to establish that Delco published those statements. *See Restatement (Second) of Torts,* §§ 558, 577 (1977) (publication is essential to liability). As previously discussed, the only testimony on the subject at trial attributed the satire to the hourly employees. Vol. I, p. 60. The plaintiff contends, however, that the failure to remove the signs promptly constitutes a defamatory publication. *See Prosser and Keeton on Torts,* Chapter 19, § 113 at 801; *Restatement (Second) of Torts,* § 577, comment p (defendant must "know" of the

defamation and fail to remove it). With regard to the larger sign, there was no evidence that linked responsibility for the sign to Delco Remy's management personnel. Moreover, the sign was removed shortly after it was erected, Vol. I, p. 47; thus that sign does not constitute actionable defamation.

With regard to the small stenciled sign, only one piece of evidence indicates that Delco Remy was aware of the sign. *See Restatement,* § 577, comment p. Tacket testified that he apprised Swan of the sign and Swan failed to remove it. Vol. II, p. 55. Swan categorically denied that this exchange ever occurred. Vol. III, p. 145.[8] Assuming for the purposes of this entry that the conversation occurred, Tacket admitted on cross-examination that although he was obligated to enforce the shop rules (which prohibited the unauthorized posting of signs), he did not order maintenance to remove the sign. Vol. II, pp. 106–07. In addition, Tacket admitted that he never apprised his immediate supervisor of the sign, *id.,* but rather asked Swan, an identically situated Level 7 supervisor, to have the sign removed. Vol. II, p. 55. Swan testified that whenever he encountered his own name derogatorily referred to on the company walls, he simply ordered the sign removed. Vol. III, p. 145.

The plaintiff testified that he observed the sign shortly after he returned to work, prior to the time that any Delco Remy management level personnel observed it. Vol. II, p. 55. The doctrine of avoidable consequences "denies recovery for any damages which could have been avoided by reasonable conduct on the part of the plaintiff." *Prosser & Keeton on Torts,* Chapter 11, § 65, at 458. A plaintiff must exercise "proper care for the protection of his own interests" and act in accordance with "the standard of reasonable care under the circumstances." *Id.* (footnote omitted). Because the plaintiff failed to take any steps which were within his authority to eliminate the defamation, he is not entitled to

---

**8.** Testimony accused Lyle Crouse of being aware of the sign. Crouse testified, however, that he first learned of the sign during a pre-trial deposition, and that he had the sign removed the following day. Vol. III, pp. 52–53.

recover from his employer for consequences he himself could have avoided.

### C. *Qualified Privilege*[9]

■ Assuming, *arguendo*, that the communications discussed above were both defamatory and false, Delco Remy published those statements within the bounds of their qualified privilege.

> [A] communication made in good faith on any subject matter in which the party making the communication has an interest or in reference to which he has a duty either public or private, either legal, moral, or social, if made to a person having a corresponding interest or duty, is privileged.

*Elliot v. Roach,* 409 N.E.2d 661, 672 (Ind. App.1980) (quoting *Libel & Slander,* 18 Ind. Law Ency. § 52 at 475 (1959)). The essential elements of the qualified privilege are "good faith, an interest to be upheld, a statement limited in scope to this purpose, a proper occasion, and publication in a proper manner to the appropriate parties only." *Shallenberger v. Scoggins–Tomlinson, Inc.,* 439 N.E.2d 699, 707 (Ind.App. 1982).

The circumstances surrounding each of the four communications introduced by the plaintiff are as follows:[10]

*Jack Huffman:* On March 28, 1985, Level 8 general supervisor of Plant 17 calls a meeting of five to six general foremen in Plant 17. Vol. I, pp. 35–37. They were told of Tacket's suspension to prevent them from being surprised by questions from the hourly personnel. Vol. I, p. 38.

*Ron Swindell:* Swindell, an hourly millwright in Plant 17 subject to the immediate supervision of Spearman and Tacket, is called into a meeting of Plant 17 skilled tradesmen. Vol. I, pp. 82–84. They were informed of Spearman and Tacket's predicament because that predicament put those personnel "on their own from that time forth." Vol. I, p. 85. Swindell testified that the party conducting the meeting refused to answer the skilled tradesmen's questions for additional information. Vol. I, p. 93.

*John Maier:* Maier, a machine repair journeyman in Plant 17 subject to Tacket's supervision, is called into a meeting of Plant 17 maintenance personnel by a management level employee. Vol. III, pp. 63–64. The meeting was brief; the maintenance personnel were told the facts, no explanation was given for the suspension, and the statuses of Tacket (suspended) and Spearman (terminated) were distinguished. Vol. III, p. 67. Maier also testified that he already knew of the termination and suspension prior to the meeting. Vol. III, p. 71.

*David Stone:* Stone, a Level 6 manufacturing supervisor, receives word indirectly from the barber shop the morning after Tacket's suspension, that Tacket had been suspended. Vol. I, p. 66. Stone and other foremen sought out their supervisor and requested an explanation for the barber shop rumor because they needed to have the facts to perform their jobs. Vol. I, pp. 67, 77. Their supervisor did not answer them but promised to look into it. Vol. I, p. 68. Four days later, the supervisor provided them with the requested information.

In each of the above communications, the parties involved shared a common business

---

**9.** The defendant contends that because the communications occurred between Delco Remy employees, the alleged defamations were never "published" to outside third parties; thus, no liability can attach. Case law support for this position does exist. *L. Cohen & Co., Inc. v. Dun & Bradstreet, Inc.,* 629 F.Supp. 1425, 1427 (D.Conn.1986); *Brockman v. Detroit Diesel Allison Div.,* 174 Ind.App. 240, 245–46, 366 N.E.2d 1201, 1204 (1977); *contra Prosser and Keeton on Torts,* chap. 19, § 113 at 798 n. 15 (such a communication is "published" and cases holding otherwise confuse privilege and publica-

tion). Because of its questionable validity under the present circumstances, this Court is reluctant to premise its holding upon lack of publication grounds.

**10.** The aforementioned communication between William Steinbrunner and his friend's wife unquestionably involved a simple true statement of fact. For this reason, it is not necessary to discuss that statement in the context of a qualified privilege.

interest in the information as well as a need to know the information in order to perform their jobs effectively. *See Knight v. Baker*, 173 Ind.App. 314, 363 N.E.2d 1048 (1977). In addition, only the barest facts were communicated to those assembled, and the information was disseminated in somewhat formalized settings. Moreover, Tacket's suspension was common knowledge prior to the time that Delco Remy conducted these meetings to "publish" the defamation. Vol. I, pp. 39–40, Vol. I, p. 66 and Vol. III, p. 71. In fact, in the final instance set forth above, the foremen already aware of Tacket's suspension demanded an explanation in order to perform their jobs. As a result, the aforementioned communications not only fell within Delco Remy's qualified privilege, but, given the widespread rumors permeating the plant, such communications were essential in order to set the record straight. *See Knight*, 173 Ind.App. at 319, 363 N.E.2d at 1051.

### 1. *Abuse of the Qualified Privilege*

Similar to any other qualified privilege, the protection provided by this qualified privilege is conditional and is lost in the event of abuse. *See Shallenberger, Roach* and *Weenig v. Wood*, 169 Ind.App. 413, 349 N.E.2d 235 (1976). The Court will address separately the grounds for abuse proposed by the plaintiff.

### a. *Malice and failure to adequately investigate*

■ A plaintiff may overcome a defendant's qualified privilege by showing that the defendant acted with malice in publishing the defamatory statements. *Weenig*, 169 Ind.App. at 436, 349 N.E.2d at 249. *Weenig* defines malice as "going beyond the scope of the purposes for which the privilege exists." *Id.* In this case, the plaintiff contends that in "publishing" the defendant demonstrated malice by failing to conduct an adequate investigation into the shipping container scandal prior to Tacket's suspension. The plaintiff argues that because of this inadequate investigation, the defendant's statements linking Tacket to the shipping containers scheme

lacked probable cause and were therefore malicious. *See* Vol. II, pp. 138–41.

An employer's failure to conduct an adequate investigation prior to publishing derogatory statements about an employee may constitute malice. *See De Ronde v. Gaytime Shops*, 239 F.2d 735 (2nd Cir. 1957). In this case, however, ample evidence existed at the time of Tacket's suspension to justify both the suspension and the concomitant investigation. As a result, the defendant's publication of the plaintiff Tacket's suspension was not "reckless," "wanton" or "malicious." *See id.* at 738. The following factors rendered the transaction, as well as Tacket's involvement therein, suspicious:

(i) the requisition involved a large payment ($90,000) to an outside producer (out-source) for products which Delco Remy had the potential to build in-house; Vol. III, pp. 92, 142;

(ii) Tacket's signature appeared twice in two different locations on the tainted requisition forms;

(iii) Tacket greatly exceeded the bounds of his authority in signing the form the second time;

(iv) Tacket hand-carried the requisition forms through each essential processing step, personally obtaining an emergency ("HERC") stamp which accelerated the processing of the forms;

(v) Tacket came to the plant and processed the requisition forms during his unpaid free time (off duty);

(vi) the management was aware that Spearman was building boxes in his garage prior to the time it took any action, Vol. III, p. 143;

(vii) Spearman and Tacket had a personal and professional relationship;

(viii) the signatures of Spearman and Tacket were the essential signatures on an order to purchase goods from a mysterious "S & T Specialties" company; and

(ix) Tacket had never before signed a similar requisition form in a similar fashion. Vol. II, p. 98.

These facts provided ample support both for the suspension and the announcement

of the suspension. The testimony established that upon suspicion of wrongdoing, it was standard procedure for Delco Remy to suspend the potential malefactor in order to conduct the investigation while that party was off "the premises." Vol. III, pp. 29–30. Moreover, counsel for the plaintiff and the plaintiff himself conceded the reasonableness of the defendant's conduct—regarding the suspension and the investigation—under the circumstances. Vol. II, pp. 98–99, 138–39.

Finally, Tacket testified that at the time of his suspension he informed Crouse and Hornaday that certain persons, John Swan and others, would exculpate him. Vol. II, p. 36. On direct examination, however, Swan denied having any contact with Tacket concerning the boxes. Vol. III, p. 143. An employer generally has a right to rely on the truthfulness of his agents' statements, *Jorgensen v. Pennsylvania R.R. Co.*, 25 N.J. 541, 138 A.2d 24, 39 (1958). Thus, contrary to Tacket's assertions, any interview with Swan after the fact would have inculpated Tacket rather than exculpated him. As a result, the defendant's suspicions regarding Tacket were both reasonable and justified.

b. *Excessive publication*

 The other ground proffered by the plaintiff to rebut the defendant's qualified privilege is excessive publication. *Lawson v. Howmet Aluminum Corp.*, 449 N.E.2d 1172 (Ind.App.1983). A defendant loses the protection of the qualified privilege if the alleged defamatory statements are published to persons who have no reason to receive the information. *Shallenberger; Elliot v. Roach*, 409 N.E.2d 661 (Ind.App.1980).

In this case, Delco Remy's statements did not constitute excessive publication. The plaintiff established four communications fairly traceable to Delco Remy. Three of the four communications involved only persons working in Plant 17, Vol. I, pp. 35–47, 82–90, Vol. III, pp. 63–71, the plant in which both Spearman and Tacket exercised substantial supervisory authority. Also, the fourth communication was demanded by four to five foremen in another plant after they had already heard about the suspensions on the plant floor. Vol. I, pp. 63–73. These foremen solicited the communication (the communication occurring approximately four days after the solicitation) because they stated it was necessary in order for them to do their work. Vol. I, pp. 75–77. Thus, there is no evidence that Delco Remy communicated Tacket's suspension to persons who had no reason to receive the information.

Finally, Tacket asserts that because an original publisher is responsible for foreseeable repetitions and because news of his suspension in relation to the requisition form scandal was so widespread, Delco Remy must be guilty of excessive publication. This Court, however, concludes that Delco Remy may not be held responsible for the rumors circulating in the plant because the plaintiff failed to establish any link between the four communications before this Court and the rumor mill operating on the plant floor. First, two of the four witnesses testifying as to the Delco Remy management communications admitted that they not only knew of the suspension but also knew the reason for the suspension prior to the management communications. Vol. I, pp. 63–67, Vol. III, p. 63. One witness testified that others had been discussing Tacket's suspension at the barber shop the morning following the suspension, *prior* to any of the alleged defamatory communications. Vol. I, p. 66.

The source of these latter defamations could not have been the communications proffered by the plaintiff. Moreover, based upon this record there is nothing to link these rumors to any statements by Delco Remy management personnel. A large corporation may not be held accountable for rumors circulating amongst their employees prior to any statements on the matter by their authorized agents. Moreover, aware of the widespread rumors circulating on the floor, Delco Remy had an obligation "to clarify any of the employees' misconceptions" regarding Tacket's suspension. *Knight v. Baker*, 173 Ind.App. 314, 319, 363 N.E.2d 1048, 1051 (Ind.App. 1977). As a result, Delco Remy did not

exceed the limits of its qualified privilege when it made the aforementioned communications to its employees.

## III. CONCLUSION

For the reasons stated above, the defendant's motion for a directed verdict at the close of all of the evidence is granted and this Court enters a verdict in favor of the defendant accordingly.