Paul Steven SCHRADER, Steven L. Dunbar, Glenn E. Lawson, Appellants–Plaintiffs,

v.

ELI LILLY AND COMPANY, Appellee–Defendant.

Ralph BODLE, Appellant–Plaintiff,

v.

ELI LILLY AND COMPANY, Appellee–Defendant.

Francis BEHLER, Appellant–Plaintiff,

v.

ELI LILLY AND COMPANY, Appellee–Defendant.

No. 12A02–9209–CV–437.[1]

Court of Appeals of Indiana, First District.

Sept. 21, 1993.

Rehearing Denied Oct. 29, 1993.

---

1. This case was transferred to this office June 29, 1993, by direction of the Chief Judge.

Douglass R. Shortridge, Indianapolis, James R. Martin, Kokomo, for appellants-plaintiffs.

Roberta Sabin Recker, Robert K. Stanley, Ellen E. Boshkoff, Baker & Daniels, Gayle L. Pettinga, Eli Lilly and Company, Indianapolis, for appellee-defendant.

ROBERTSON, Judge.

Paul Steven Schrader, Steven L. Dunbar, Glenn E. Lawson, Ralph Bodle, and Francis Behler appeal from the grant of summary judgment in favor of their fo..mer employer, Eli Lilly and Company, in their defamation suit. They allege the following errors:

I. Did the trial court commit error in granting Summary Judgment to Eli Lilly and Company ("Lilly") on the basis that intracompany transfers of information concerning allegations of theft against employees as communicated to management personnel and to fellow employees did not constitute a "publication" as required by Indiana law in a defamation action?

II. Did the trial court incorrectly apply the law of qualified privilege applicable to a defamation action by granting Summary Judgment to Lilly when the former employees came forward with evidence of malice by showing excessive publication which under Indiana law creates a question of fact for the jury?

III. Did the trial court commit error in granting Summary Judgment to Lilly on the basis that the statements made of and concerning the Appellants (employees) and accusing them of theft were "true" when Indiana law provides that the determination of truth in a defamation action is a question of fact for the jury?

We affirm in part and reverse in part.

A summary judgment is proper only where there is no genuine issue about any material fact and the moving party is entitled to judgment as a matter of law. *City of Evansville v. Moore* (1990), Ind., 563 N.E.2d 113, 114. Any doubt about the existence of a factual issue should be resolved against the movant, with all properly asserted facts and reasonable inferences construed in favor of the nonmovant. *Id.*

On review of a ruling on summary judgment, this Court applies the same standard applicable in the trial court. *Webb v. Jarvis* (1991), Ind., 575 N.E.2d 992, 994. The appellants must persuade this court that the determination below was erroneous. *Depart. of Revenue v. Caylor–Nickel Clinic* (1992), Ind., 587 N.E.2d 1311, 1313. The trial court's determination must be carefully scrutinized on appeal to assure that the appellant is not improperly prevented from having its day in court. *Id.*

The designated evidence in the light most favorable to the former employees reveals that they had all been long-time employees of Lilly when rumors arose about theft at the Tippecanoe Laboratories. In the summer of 1990, Lilly management began an internal investigation of these theft rumors and interviewed more than 30 employees, including the former employees involved in this suit. As a result of the investigation, Lilly discharged these five former employees.

The rumors continued during and after the termination. During the investigation, the rumors had reached the point where some of the approximately 1500 employees of the Tippecanoe Laboratories had believed that these five or six employees would be fired for stealing. Some of the rumors had specifically named one or more of these former employees. Lilly had not formally communicated the fact of the investigation to the employees, but Lilly also could not have hidden the fact that many employees were being interviewed. After the employees' discharge, rumors circulated in the plant and in the surrounding community that the former employees had been fired for stealing and that as many as 100 of the other employees in other areas of the plant were to be fired for theft.

In light of these continued rumors, the Director of the Tippecanoe Laboratories included a slide presentation in his weekly plant staff meeting for the managers of the plant on September 19, 1990. Some of the managers regularly took notes of these meetings so that they could communicate the pertinent information to department heads, supervisors, and employees under them. One such manager took notes on the contents of the slide presentation on September 19, 1990, and had his secretary type them for him. The typed notes were then transmitted to various department

heads, supervisors, and employees; and, according to usual policy, one of the department heads posted the typed notes on the bulletin board in Building T–6. The typed notes stated:

6. Warehouse Situation—[Director]

- Six employees have been dismissed
- Other disciplinary actions have been taken
- The reason for separation is a loss of confidence in those individuals as employees of Eli Lilly and Company
- The process has been fair, firm and consistent
- Respect for the individual has been an integral part of the process
- The core values of Lilly are based on trust and honesty—we must communicate these clearly
- We cannot tolerate a loss of trust and honesty as a company or as individuals
- It is over.

At the pre-appeal conference, the former employees limited their appeal to their actions for libel. See *ORDER PURSUANT TO APPELLATE RULE 2(C) CONFERENCE.* Our review is therefore limited to the effects of the slide presentation and the written notes and does not include any unrelated oral statements consistent with the contents of the written statements.

Lilly has removed the issue of publication to its employees from this appeal. Lilly submitted its MOTION TO AMEND ORDER PURSUANT TO APPELLATE RULE 2(C) CONFERENCE, which included a statement that "Lilly has elected not to argue lack of publication as a ground for affirming the trial court's entry of summary judgment on the [former employees'] libel claims." Lilly requested that this court amend its pre-appeal order to read that Lilly:

agrees that it will not argue lack of publication as a ground for affirming the trial court's entry of summary judgment for [Lilly] on the [former employees'] libel claims. Accordingly, publication will not be an issue on appeal with re-

gard to the [former employees'] libel claims.

This Court granted the motion and amended its pre-appeal order accordingly.

■■■ To maintain an action for defamation, a plaintiff must show a communication with defamatory imputation, malice, publication, and damages. *Rambo v. Cohen* (1992), Ind.App., 587 N.E.2d 140, *trans. denied.* As for defamatory imputation, some communications are reasonably susceptible to either a defamatory or a nondefamatory interpretation. See *id.* Words not actionable in themselves may express a criminal charge, by reason of their allusion to some extrinsic fact, or of their being used and understood in a different sense from their natural meaning, and thus become actionable. *Hays v. Mitchell* (1844), 7 Blackf. 117. Such words are deemed actionable per quod, and they acquire a defamatory meaning when placed in context or are connected with extrinsic facts or circumstances. *Jacobs v. City of Columbus* (1983), Ind.App., 454 N.E.2d 1253, 1264 (citing concurring opinion in *Gibson v. Kincaid* (1966), 140 Ind.App. 186, 221 N.E.2d 834). If the defamatory nature of the words appears without resort to extrinsic facts or circumstances, then the words are deemed actionable per se.

■■ The words involved in this case—the reason for separation is a loss of confidence in those individuals and Lilly cannot tolerate a loss of trust and honesty—are not actionable, in and of themselves, as an imputation that the individuals committed theft. A trier of fact could, however, determine that a defamatory imputation is present in this case in light of the extrinsic facts and circumstances, such as the rumors about the thefts, the existence of the investigation of the former employees, and the terminations of their employments. Lilly relies upon *Tacket v. Delco Remy Div. of General Motors Corp.* (S.D.Ind. 1987), 678 F.Supp. 1387, *aff'd in part, rev'd in part on other grounds* (7th Cir. 1987), 836 F.2d 1042, in which Delco suspended Tacket on suspicion of misconduct and other employees inferred that the misconduct meant theft. The *Tacket* court

stated that some misunderstanding was inevitable and that the employer was not liable for the misunderstandings some people are bound to entertain about a suspension, even after it has been explained to them. The *Tacket* court affirmed the district court, which had taken the case away from the jury on the issue of truth, and stated:

> The defense of truth, recognized in Indiana, *Elliott v. Roach*, 409 N.E.2d 661, 681 (Ind.App.1980), would be worth very little if misunderstandings of true statements—misunderstandings generated by rumors that the speaker may have been trying to control—gave rise to liability. The district court, applying the "qualitative" assessment permitted under Indiana law, was entitled to conclude that in the circumstances of this case an inference of falsehood from the "understandings" of witnesses unable to recount the speakers' words would not be reasonable.

*Id.* at 1046. In the present case, we are not faced with a possible inference of falsehood from the "understandings" of witnesses unable to recount the speakers' words. Here, we have a possible falsehood from written notes in which the words and their placement are present and undisputed. An inference of falsehood in the present case would not be unreasonable.

Also with regard to truth as a defense, Lilly claims it should not be held liable for telling its own employees the same thing the former employees and their family members tell others to explain their terminations. Lilly should direct its truth argument to the jury. Simply stated, the circumstances and extrinsic facts must be considered in the determination about whether the words were "true" or carried a defamatory meaning.

▮▮▮ When reasonably susceptible to either interpretation, the jury will decide whether words were used in their defamatory or non-defamatory meaning. *See Rambo*, 587 N.E.2d at 145. *See also*, Restatement (Second) Torts § 614(2) (The jury determines whether a communication, capable of a defamatory meaning, was so understood by its recipient); Restatement (Second) Torts § 563, Comment e ( ... the decisive question is what the person or persons to whom the communication was published understood as the meaning intended to be expressed. Unless this is free from reasonable doubt, it is for the jury to determine the meaning and construction of the alleged defamatory language ...). Whether the words were "true" or not depends upon whether the jury determines the former employees stole from Lilly or not and also whether the jury determines the words were defamatory or not under the circumstances. Thus, the trial court improperly granted summary judgment to Lilly after having determined the words were "true" as a matter of law.

▮▮▮ A communication may be defamatory per se or per quod. *Rambo*, 587 N.E.2d at 145. This is not the same as being actionable per se or per quod. If the communication is defamatory per se, the plaintiff is entitled to presumed damages and may receive an award for presumed damages and special damages. *See id.* All other defamation is, at most, defamation per quod and is actionable only if it causes the plaintiff special damages. *See id.*

▮▮▮ A statement which falsely charges another person with the commission of a crime is defamatory per se. *Short v. Acton* (1904), 33 Ind.App. 361, 71 N.E. 505 (applies to charge of larceny); *Tracy v. Hacket* (1898), 19 Ind.App. 133, 49 N.E. 185. *See also, Agnew v. Hiatt* (1984), Ind.App., 466 N.E.2d 781 (statement that plaintiff was a thief was defamatory per se). Thus, general damages are presumed to follow from the imputation of crime. *Indianapolis Newspapers, Inc. v. Fields* (1970), 254 Ind. 219, 259 N.E.2d 651, *cert. denied*, 400 U.S. 930, 91 S.Ct. 187, 27 L.Ed.2d 190. Also, the law presumes that a publication falsely charging a person with a crime was malicious. *Gaul v. Fleming* (1858), 10 Ind. 253, 255. The defamatory imputation here is that the former employees committed theft, and we presume

that the publication was malicious and damaging.

Lilly raises the issue of qualified privilege, which is a matter of defense. *Chambers v. American Trans Air, Inc.* (1991), Ind.App., 577 N.E.2d 612, 615, *trans. denied.* A qualified privilege does not change the actionable quality of words published but only rebuts the element of malice implied by law for the making of a defamatory statement. *Boydston v. Chrysler Credit Corp.* (1987), Ind.App., 511 N.E.2d 318, 321.

Qualified privilege applies to communications made in good faith on any subject matter in which the party making the communication has an interest or in reference to which he has a duty, either public or private, either legal, moral, or social, if made to a person having a corresponding interest or duty. *Bals v. Verduzco* (1992), Ind., 600 N.E.2d 1353, 1356. The privilege arises out of the necessity for full and unrestricted communication on matters in which the parties have a common interest or duty. *Chambers*, 577 N.E.2d at 615 (citing *Shallenberger v. Scoggins–Tomlinson, Inc.* (1982), Ind.App., 439 N.E.2d 699).

Absent a factual dispute, whether a statement is protected by a qualified privilege is a question of law. *Id.* (citing *Lawson v. Howmet Aluminum Corp.* (1983), Ind.App., 449 N.E.2d 1172). Intracompany communications regarding the fitness of an employee are protected by the qualified privilege. *Id.*

The protection afforded a qualified privilege may be lost upon a showing it was abused: that the communicator was primarily motivated by feelings of ill will, that there was excessive publication of the defamatory statement, or that the statement was made without a belief or grounds for belief in its truth. *See Boydston*, 511 N.E.2d at 321. The privilege is lost if the defamation goes beyond the group interest or if publication is made to persons who have no reason to receive the information. *Weenig v. Wood* (1976), 169 Ind.App. 413, 435, 349 N.E.2d 235, 248 (quoting Prosser,

*Law of Torts* at 791 (4th ed. 1971)). The issue of abuse of a qualified privilege should only be submitted to the jury if there is sufficient evidence to raise the issue and if different inferences and conclusions reasonably may be drawn from the evidence. *Olsson v. Indiana Univ. Bd. of Trustees* (1991), Ind.App., 571 N.E.2d 585, 588, *trans. denied.*

Lilly first claims that the communications to the managers and to all employees were qualifiedly privileged. In one case Lilly cites, the plant superintendent discharged an employee for taking tickets which were used to determine the amount of pay due the employees. *Knight v. Baker* (1977), 173 Ind.App. 314, 315–316, 363 N.E.2d 1048, 1051. This occurred in the presence of an acting foreman and an assistant plant manager. In addition, the plant superintendent informed one co-worker that "they had gotten the person taking the tickets" and another co-worker that the "missing tickets had been found in the [discharged employee's] pocket and he had been terminated." *Id.* at 316, 363 N.E.2d at 1051. The court stated:

It is clear from the record that the communications by [the plant superintendent] were *prima facie* within the qualified privilege as all the employees had a pecuniarily common interest in the operation of the metal buffing department [of the company]. In addition, the overall atmosphere and relationship among the employees was of prime concern to [the plant superintendent and the corporation president]. They were under a duty to clarify any of the employees' misconceptions within the realm of their mutual interests.

*Id.* at 319, 363 N.E.2d at 1051.

The designated material in the present case shows that morale and output of many employees were low throughout the site after Lilly had discharged the former employees due to persistent rumors that the investigations of theft were continuing and that many more employees throughout the site would be discharged. Many of the employees knew, however,

that the investigations were limited in scope to alleged thefts at the particular warehouse to which the former employees had some connection.

The former employees have not shown that the slide presentation to the managers was anything other than a communication made in good faith on a subject matter in which Lilly and the managers each had an interest, that is, maintaining good employee morale and protecting high employee output. Lilly was under a duty to inform the managers, within the realm of their mutual interests in employees and output, so that the managers could, in turn, clarify their respective employees' misconceptions about the existence of further investigations or the possibility of future discharges. Thus, as a matter of law, the communications were within the scope of the purposes for which the qualified privilege existed; and Lilly therefore had a lawful excuse to communicate the information to its managers. *See Lawson*, 449 N.E.2d at 1175 (plant manager and supervisors). *See e.g., Garziano v. E.I. Du Pont De Nemours & Co.* (5th Cir.1987), 818 F.2d 380. No genuine issue of material fact exists here. As a matter of law, all communications from Lilly to its managers are protected by the qualified privilege.

The same is not necessarily true about the typed notes on the bulletin board. The designated matter does not indisputably show that each of the 1500 Lilly employees had a corresponding interest in morale or output. After the discharge, rumors circulated in the plant that the former employees had been fired for stealing and that as many as 100 of the other employees in other areas of the plant were to be fired for theft. While many of these employees certainly had low morale and output or had concerns for their jobs, one may reasonably infer that many others at the site had no connection with the warehouse and knew the investigations had been limited to the particular warehouse in question.

 Unless only one conclusion can be drawn from the evidence, the determination of the question whether the privilege has been abused is for the jury. *Bals*, 600

N.E.2d at 1357 (quoting Prosser at 796). Further, in an appropriate case, a trier of fact may determine the privilege was abused by excessive publication. *Elliott v. Roach* (1980), Ind.App., 409 N.E.2d 661, 673 (citing Prosser at 792–796).

 That the employees were employees is not dispositive of the issue. The employees must also have had a corresponding interest in the subject matter. Some of these Lilly employees were subjects of the qualified privilege, but Lilly has not demonstrated that all of them were. The employees who had no misconceptions were not covered by the privilege because Lilly's interest or duty is to clarify misconceptions and it could not have had an interest or duty to clarify misconceptions which did not exist. Thus, the occasion was a matter of qualified privilege because the qualified privilege extended to · some of the employees, that is, those with a corresponding interest. The jury must still decide, however, whether the exercise and use of the qualified privilege was proper or improper when the qualified privilege did not necessarily extend to all of the employees. *See e.g., Garziano*, 818 F.2d at 385–387. *But see, Harris v. Procter & Gamble Mfg. Co.* (1991), 102 N.C.App. 329, 401 S.E.2d 849, *rev. denied*, 329 N.C. 269, 407 S.E.2d 836. The former employees have produced evidence which shows that the communications to all Lilly employees did not, as a matter of law, arise out of the necessity for full and unrestricted communication on matters in which they and Lilly had a common interest or duty. In short, a genuine issue of material fact exists about whether Lilly abused the privileged occasion by going beyond the scope of the purposes for which the privilege existed.

 The former employees claim that, even if the qualified privilege applied to some of the Lilly employees, they showed that Lilly had engaged in excessive publication to the outside contractors and subcontractors. Former employees Behler and Bodle designated their own affidavits to the trial court in their respective responses to Lilly's motion for summary judgment.

These affidavits are identical in much of their contents.

The five former employees filed separate actions against Lilly on identical claims of written defamation, and the cases were eventually consolidated before Lilly moved for summary judgment. On this issue, Lilly first claims that Plaintiffs' counsel were granted leave to file responses after the summary judgment hearing only in the Bodle and Behler suits and that these affidavits and the claims they support do not apply to the Schrader, Dunbar, or Lawson suits. Indiana Trial Rule 56(C) states that:

> A party opposing the motion shall also designate to the court each material issue of fact which that party asserts precludes entry of summary judgment and the evidence relevant thereto. The judgment sought shall be rendered forthwith if the designated evidentiary matter shows that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.

In this case, a party opposing the motion, in fact two of them, designated to the trial court material issues of fact which they asserted precluded entry of summary judgment and the evidence relevant thereto. If the designated evidentiary matter shows that there is a genuine issue as to any material fact and that Lilly, as the moving party, is not entitled to judgment as a matter of law, then the summary judgment Lilly has sought shall not be rendered forthwith regardless of which of the plaintiffs here designated the issue or the evidence. Further, T.R. 56(H) states that:

> No judgment rendered on the motion shall be reversed on the ground that there is a genuine issue of material fact unless the material fact and the evidence relevant thereto shall have been specifically designated to the court.

The Bodle and Behler affidavits were "specifically designated" and are a part of the "designated evidentiary matter" in this consolidated case. *Cf. Rosi v. Business Furniture Corporation, Ind.*, 615 N.E.2d 431 (1993). This Court will therefore consider them to determine whether Lilly met its burden to prove it is entitled to judgment on its motion.

Lilly also claims that we cannot consider these affidavits because they are not based upon personal knowledge but upon hearsay or speculation. Many of the statements were, however, based upon personal knowledge or admissions and not upon hearsay:

\* \* \* \* \* \*

> Early in my employment at Lilly and throughout the time of my employment, I became aware of what I consider permanent outside contractors ... In addition, there are many other contractors and subcontractors who work both bid jobs and time and material jobs ... During the summer of 1990, including July, August and September, there was a great deal of construction going on at the Tippecanoe Laboratories ...

\* \* \* \* \* \*

> ... I believe that in any given month during this time frame up to 500 outside contractor personnel would have been working at the Tippecanoe Plant site. I base this upon my own observation as well as Lilly informational directives which stated that there were more outside contractors working on the day shift during this period than Lilly employees. This would mean there were over 400 Lilly employees working on the day shift so that outside contractor individuals would exceed that number.

\* \* \* \* \* \*

> Bulletin boards of Eli Lilly Tippecanoe Laboratories are used for both official and unofficial notices. For example, the bulletin board in the Building T6 Power House is approximately 3' × 4' and is cork. Items are tacked onto this bulletin board. This could include official notices for information to employees as well as private notices of selling items or services. The T6 bulletin board is located just outside of the breakroom ...

\* \* \* \* \* \*

> Outside contractors work both on bid jobs and on time and materials. Outside contractor employees are, in my experi-

ence and personal observation, in every building on the site at some time or another ...

\* \* \* \* \* \*

The Tippecanoe Laboratory works and is in operation seven days a week, 24 hours a day. More people work the day shifts and more outside contractors work the day shift but construction is not restricted to five day [sic] a week day shift only. Outside contractors were in the Plant site doing repair, maintenance, building, demolition and the like at all times and in all buildings at one time or another ... Thus, from my observation over my years at Eli Lilly and Company, I can state upon personal knowledge that contractor personnel were in all buildings and read bulletin boards in various buildings and break rooms.

The designated matter does not indisputably show that any or all of the outside contractors or subcontractors had a corresponding interest in morale, output, or job security or that they were covered by the privilege. Any outside contractors or subcontractors who had no misconceptions were not covered by the privilege because Lilly's interest or duty is to clarify misconceptions and it could not have had an interest or duty to clarify misconceptions which did not exist. Thus, although the occasion was a matter of qualified privilege because the qualified privilege extended to some of the Lilly employees, the jury must decide whether the exercise and use of the qualified privilege was proper or improper when the qualified privilege did not necessarily extend to any of the outside contractors or subcontractors. Again, the former employees have produced evidence which shows that the communications to any or all outside contractors or subcontractors did not, as a matter of law, arise out of the necessity for full and unrestricted communication on matters in which they and Lilly had a common interest or duty. Thus, a genuine issue of material fact exists about whether Lilly abused the privileged occasion by going beyond the scope of the purposes for which the privilege existed.

As for speculation, Lilly notes that neither Bodle nor Behler were employed at the Tippecanoe Laboratories when the typed notes were posted on or after September 19, 1990. Bodle's and Behler's last days there were September 14, 1990, and August 30, 1990, respectively. In light of this, Lilly claims that neither of them possess the requisite personal knowledge to state whether outside contractors were present at the plant during the time the typed notes were posted or to state whether outside contractors actually had access to the specific bulletin board on which the typed notes were posted. The jury could, however, reasonably infer that the longtime practice stated in the affidavits remained in effect during the short period of time after the discharges and that the outside contractors and subcontractors were present and had sufficient access to the typed notes. Lilly also claims that, regardless of whether the statements were based upon personal knowledge, the affidavits are still insufficient to show any of the outside contractors read the typed notes.

▬▬▬ The basis of the action for libel is damages for injury to the character of the plaintiff in the opinion of others, and that can only arise from a publication to third persons. *See Hamilton v. Lowery* (1904), 33 Ind.App. 184, 189, 71 N.E. 54, 56. Such publication amounts to a communication of defamatory matter to a third person. *Kolczynski v. Maxton Motors, Inc.* (1989), Ind.App., 538 N.E.2d 275, 276 (citing 18 I.L.E. *Libel and Slander* § 42 (1959)). *See also, Brockman v. Detroit Diesel Allison Div.* (1977), 174 Ind.App. 240, 244, 366 N.E.2d 1201, 1202. With regard to slander, the words uttered should be such as convey to the minds of the hearers an imputation of a crime. *Seller v. Jenkins* (1884), 97 Ind. 430, 431. If the words used are such as produce upon the minds of those who hear them an impression that the plaintiff was guilty of a crime, they are actionable, although they may not fully describe an offense. *Id.* (citing *Drummond v. Leslie* (1840), 5 Blackf. 453).

This rule seems equally applicable to the form of libel present here: the words writ-

ten should be such as to convey to and produce upon the mind of the reader an imputation of a crime. See Restatement (Second) Torts § 559, Comment a (The word "communication" is used to denote the fact that one person has brought an idea to the perception of another.). Slander once involved both "oral slander" and "written slander." *See Clarkson v. McCarty* (1841), 5 Blackf. 575; *Fenstermacher v. Indianapolis Times Pub. Co.* (1936), 102 Ind.App. 189, 1 N.E.2d 655. We now equate "written slander" with a form of libel; and the civil caselaw does not suggest the requirement, that the message must convey to and produce upon the mind an imputation of crime, is not equally applicable to the written word as the spoken word. The gravamen of a defamation action is harm to the plaintiff's reputation in the eyes of others. *Rambo*, 587 N.E.2d at 146. A message which does not carry a defamatory meaning to the mind of another could be considered non-injurious to one's reputation; for, if the other does not grasp the defamatory meaning, then the statement would have no damaging effect upon the person's reputation. *See e.g.*, Restatement (Second) Torts § 577, Comments b and c. For example, a libel mailed to the plaintiff himself would not show a publication of the libel. *Hamilton*, 33 Ind.App. at 189, 71 N.E. at 56 (citing *Waistel v. Holman*, 2 Hall. (N.Y.) 172). In such a situation, no publication to a third person has occurred. The sending of a libelous circular letter by mail, however, constitutes a publication of the libelous matter therein contained to every person who reads such letters. *Sourbier v. Brown* (1919), 188 Ind. 554, 559, 123 N.E. 802, 803.

Some cases from other jurisdictions provide that a libel must be read and understood by a third person to be defamatory. *See e.g., Renfro Drug Co. v. Lawson* (1942), 138 Tex. 434, 160 S.W.2d 246 (exhibition of magazine for sale not enough without proof that it was sold or that its contents were brought to the attention of another). *See also, Jacobs*, 454 N.E.2d at 1264 (for the purpose of discussion, court accepted argument that statements were understood to refer to plaintiff by persons who read it).

Some cases, however, allow an inference that a third person read and understood the libelous words. *See e.g., Kimm v. Steketee* (1882), 48 Mich. 322, 12 N.W. 177 (newspaper in foreign language); Restatement (Second) Torts, § 577, Comment d (same). The placement of notes on a bulletin board to which different groups have access is unquestionably different from circulations of periodicals, books, or newspapers; broadcasts over radios or televisions; or exhibitions of motion pictures to the public at large. For these, exposure to public is generally sufficient for publication. *See generally*, 50 Am.Jur.2d, Libel and Slander §§ 160–162. Nevertheless, some circumstances allow, when a writing is exposed to some group of individuals, the trier of fact to reasonably infer that a publication, in its defamatory sense, occurred. *See e.g.*, 50 Am.Jur.2d, Libel and Slander, § 155 (The placing of placards where they will attract attention is undoubtedly sufficient publication to render the person placing the placards liable for defamation ...); Odgers, A Digest on the Law of Libel and Slander (1881), 153 (Posting up a libellous placard and taking it down again before any one could read it, is no publication; but if it was exhibited long enough for any one to read it, then it is a question of fact for the jury whether any one actually did read it). The same result appears in two slander cases, *Southwest Drug Stores, Inc. v. Garner* (1967), Miss, 195 So.2d 837, and *Little Stores v. Isenberg* (1943), 26 Tenn.App. 357, 172 S.W.2d 13, in each of which a witness who may have actually heard the words spoken need not have been produced for trial because the jury might infer publication upon a showing that the words had been uttered in a loud voice in the presence of others.

The defamatory matter here took the form of typed notes on a bulletin board to which outside contractors and subcontractors had had access. The former employees have produced no direct evidence to show that the defamatory meaning was presented to and understood by the minds

of the outside contractors through the typed notes during the time they were posted on the bulletin board. Nevertheless, under the circumstances shown here, the inference may reasonably be drawn that the defamatory meaning was presented to and understood by the mind of an outside contractor or subcontractor because an individual saw, read, and understood the notes.

In *Abofreka v. Alston Tobacco Co.* (1986), 288 S.C. 122, 341 S.E.2d 622, the plaintiff was a medical doctor who provided group health insurance benefits through the employer's benefit plan. The doctor filed two insurance claims on behalf of employees which the benefit plan's agent believed had been altered to bring the claim within the coverage provided by the policy. Without having given the doctor an opportunity to explain the claims, the benefit plan issued a memorandum to the employees which requested them to refrain from seeking medical treatments from the doctor because his treatment and charges were "not within the usual and customary realm of treatment and charges." The memorandum was posted on a bulletin board in the employer's canteen, where it was intended to be seen by employees and likely to be seen by salesmen and other visitors to the plant. *Id.*, 341 S.E.2d at 624. In pertinent part, the court stated:

> The privilege was also lost when the memorandum was published to persons other than those to whom the privilege applied. A Marnat employee testified the location of the memorandum caused it to be seen by persons other than Marnat employees ...

*Id.* at 625.

In the present case, the written notes were posted on a bulletin board in Building T–6. The affidavits state, from personal observation over the years, that contractor personnel were in all buildings and read bulletin boards in various buildings and break rooms. This is tantamount to a statement, and a jury could reasonably infer, that the location of the typed notes caused them to be seen, read, and understood by persons other than Lilly employees.

The purposeful posting of deliberately written notes on a bulletin board have the potential for more extensive and permanent harm than words spoken in passing. Over time, the notes are likely to have been seen by someone, or even a great number of people, who had access to the bulletin board. Many of these people were Lilly employees; but some of the people were outside contractors and subcontractors, not merely those employees who had employment concerns about the discharges. In short, the jury could infer that an outside contractor or subcontractor saw the notes, read them, and understood them to be defamatory. Therefore, a genuine issue of material fact exists with respect to excessive publication.

The inference of excessive publication is permitted, but the jury is not required to find an excessive publication. Lilly may still show it had a reasonable belief that the publication was a proper means to communicate the defamatory matter to those employees to whom its publication was privileged. See Restatement (Second) Torts, § 604. If, however, the jury were to find an excessive publication, the number of these individuals actually shown to have seen the notes, read the notes, and understood them to be defamatory, addresses the extent to which the reputations of the former employees were damaged. *See e.g.,* Restatement (Second) Torts, § 604, Comment c. *Cf. Wayne Works v. Hicks Body Co.* (1944), 115 Ind.App. 10, 23–26, 55 N.E.2d 382, 388–389.

Under the circumstances, the words in the typed notes could be "true" or false and are subject to either a defamatory or a non-defamatory meaning. The jury must decide these factual matters. Moreover, the jury could, but need not, infer that Lilly excessively published the words to some of its employees or to the outside contractors or subcontractors. In light of this, the trial court improperly granted summary judgment to Lilly on these matters. The trial court rightly determined, however, that Lil-

ly's communication to its managers was covered by the qualified privilege.

Judgment affirmed in part and reversed in part.

FRIEDLANDER, J., concurs.

SULLIVAN, J., concurs in result.